PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MM, a minor, by and through her
parents, DM and EM, and on their
own behalf,
               *Plaintiff-Appellee,*

         v.

SCHOOL DISTRICT OF GREENVILLE
COUNTY, a/k/a Greenville County
Public Schools,
               *Defendant-Appellant,*

         and

SOUTH CAROLINA STATE BOARD OF
EDUCATION,
               *Defendant.*

THE COUNCIL OF PARENT
ATTORNEYS AND ADVOCATES;
PROTECTION AND ADVOCACY FOR
PEOPLE WITH DISABILITIES OF SOUTH
CAROLINA; CAROLINA LEGAL
ASSISTANCE; NORTH CAROLINA
SPECIAL NEEDS FEDERATION; THE
NORTH CAROLINA GOVERNOR'S
ADVOCACY COUNCIL FOR PERSONS
WITH DISABILITIES; PISGAH LEGAL
SERVICES; MARYLAND DISABILITY LAW
CENTER,
               *Amici Curiae.*

No. 01-1364

MM, a minor, by and through her parents, DM and EM, and on their own behalf,

*Plaintiff-Appellant,*

v.

School District of Greenville County, a/k/a Greenville County Public Schools,

*Defendant-Appellee,*

and

South Carolina State Board of Education,

*Defendant.*

The Council of Parent Attorneys and Advocates; Protection and Advocacy for People With Disabilities of South Carolina; Carolina Legal Assistance; North Carolina Special Needs Federation; The North Carolina Governor's Advocacy Council for Persons With Disabilities; Pisgah Legal Services; Maryland Disability Law Center,

*Amici Curiae.*

No. 01-1411

Appeals from the United States District Court
for the District of South Carolina, at Columbia.
Joseph F. Anderson, Jr., Chief District Judge.
(CA-98-2971-3-17)

Argued: June 4, 2002

Decided: September 6, 2002

Before KING and GREGORY, Circuit Judges, and
Robert R. BEEZER, Senior Circuit Judge of the United States
Court of Appeals for the Ninth Circuit, sitting by designation.

---

Affirmed in part, reversed in part, and remanded by published opinion. Judge King wrote the opinion, in which Judge Gregory and Senior Judge Beezer joined.

---

## COUNSEL

**ARGUED:** Elizabeth Jones Smith, CLARKSON, WALSH, RHENEY & TURNER, P.A., Greenville, South Carolina, for Appellant. Paul Lawrence Erickson, THE LAW FIRM OF PAUL L. ERICKSON, P.A., Asheville, North Carolina, for Appellee. **ON BRIEF:** N. Heyward Clarkson III, CLARKSON, WALSH, RHENEY & TURNER, P.A., Greenville, South Carolina, for Appellant. Judith A. Gran, PUBLIC INTEREST LAW CENTER OF PHILADELPHIA, Philadelphia, Pennsylvania; Stacey Bawtinhimer, New Bern, North Carolina, for Amici Curiae.

---

## OPINION

KING, Circuit Judge:

The School District of Greenville County, South Carolina ("the District"), has appealed the district court's ruling that the 1995-96 Individualized Education Program ("IEP") of student MM[1] failed to provide her with a statutorily mandated "free appropriate public education." *MM v. Sch. Dist.*, C/A No.: 3:98-2971-17, Findings of Fact and Conclusions of Law (D.S.C. Aug. 17, 2000) (the "Opinion"). MM and her parents have cross-appealed, contending that the district court

---

[1]To protect the identity of the disabled child, these proceedings and those underlying it refer to the child, MM, and to her parents, EM and DM, by their initials only.

erred in four respects. As explained below, the 1995-96 IEP complied with the requirements of the Individuals with Disabilities Education Act (the "IDEA"), and we reverse the district court on the District's appeal. On the other hand, the contentions raised by MM and her parents are without merit, and we affirm on the cross-appeal.

## I.

This proceeding involves the application and construction of the IDEA, which amended the Education of All Handicapped Children Act of 1975, codified at 20 U.S.C. § 1400 *et seq.*[2] In order to place these appeals in the proper perspective, it is necessary first to review some essential legal principles under which they arise. We will then spell out the factual underpinnings of this dispute.

## A.

The IDEA was enacted in 1990 to ensure that all children with disabilities receive a "free appropriate public education" (a "FAPE"), and the IDEA emphasized the special education and related services required to meet the unique needs of such children.[3] In return for the

---

[2]The Education of the Handicapped Act of 1970 was amended in 1975 and renamed the Education of All Handicapped Children Act, before being reenacted as the IDEA in 1990. For the sake of consistency, we refer only to the "IDEA," even when discussing one of the predecessor enactments.

[3]The IDEA is intended to benefit "child[ren] with a disability," meaning children:

> (i) with mental retardation, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (hereinafter referred to as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and

> (ii) who, by reason thereof, need[ ] special education and related services.

20 U.S.C. § 1401(3)(A). We refer to IDEA beneficiaries as "disabled children" or, in the singular, as a "disabled child."

receipt of federal education funding, states are required by the IDEA to provide each of their disabled children with a FAPE. Under the IDEA, a FAPE must provide such children with meaningful access to the educational process. *Board of Educ. v. Rowley*, 458 U.S. 176, 192 (1982) ("[I]n seeking to provide . . . access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful."). That is, a FAPE must be reasonably calculated to confer some educational benefit on a disabled child. *Id.* at 207. Such an educational benefit must be provided to a disabled child in the least restrictive and appropriate environment, with the child participating, to the extent possible, in the same activities as non-disabled children. 20 U.S.C. § 1412(a)(5)(A).

The IDEA does not, however, require a school district to provide a disabled child with the best possible education. *Rowley*, 458 U.S. at 192. And once a FAPE is offered, the school district need not offer additional educational services. *Matthews v. Davis*, 742 F.2d 825, 830 (4th Cir. 1984). That is, while a state "must provide specialized instruction and related services 'sufficient to confer some educational benefit upon the handicapped child,' . . . the Act does not require the 'furnishing of every special service necessary to maximize each handicapped child's potential.'" *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997) (quoting *Rowley*, 458 U.S. at 199-200).

A school district is required by the IDEA to provide an IEP for each disabled child. An appropriate IEP must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress. 20 U.S.C. § 1414(d)(1)(A).[4] The IDEA establishes a series of elaborate

---

[4]The IDEA defines an IEP as a written statement for a disabled child, developed in accordance with the statute, that includes, inter alia:

> (i) a statement of the child's present levels of educational performance, . . . .

> (ii) a statement of measurable annual goals, including benchmarks or short-term objectives, . . . .

procedural safeguards "designed to ensure that the parents or guardian of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to these decisions." *Gadsby v. Grasmick*, 109 F.3d 940, 956 (4th Cir. 1997). The IEP must therefore be prepared by an IEP Team, which consists of a representative of the school district, the child's teacher, the parents or guardian and, where appropriate, the child herself. 20 U.S.C. § 1414(d)(1)(B).

The IDEA requires that the parents or guardian of a disabled child be notified by the school district of any proposed change to their child's IEP. It also requires that the parents or guardian be permitted to participate in discussions relating to their disabled child's evaluation and education. 20 U.S.C. § 1415(b). If the parents or guardian are not satisfied with the IEP, they are entitled to request a due process hearing. 20 U.S.C. § 1415(f). In South Carolina, that hearing is conducted before a local Hearing Officer and is appealable to a state-level Reviewing Officer. 24 S.C. Code Ann. Regs. § 43-243. Any party aggrieved by the findings and decision of a Reviewing Officer may then bring suit in state or federal court. *See id.* ("Any party aggrieved by the findings and decision . . . shall have the right to bring a civil action . . . in any State court of competent jurisdiction or in a district court of the United States . . . .").

## B.

MM recently turned eleven years old. She suffers from two disor-

---

(iii) a statement of the special education and related services and supplementary aids and services to be provided to the child . . . .

(iv) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the activities described in clause (iii) . . . .

(viii) a statement of—

(I) how the child's progress toward the annual goals described in clause (ii) will be measured . . . .

20 U.S.C. § 1414(d)(1)(A).

ders: first, from a disease called myotonic dystrophy,[5] and second, from moderate autism.[6] She thus qualifies as a "child with a disability" under the IDEA. When MM was three years old, she resided with her family in Henderson County, North Carolina. In 1994, the Henderson County school officials evaluated MM under the IDEA for a preschool program, and they developed an IEP for her benefit.[7]

In the Summer of 1995, just before her fourth birthday, MM moved with her parents to South Carolina, and they sought IDEA services for her from the District. At the District's suggestion, her parents visited two public schools in the Greenville area: the Meyers Center, a five-day-per-week preschool, and the Golden Strip Preschool, a one-day-per-week preschool. The parents then advised the District that they preferred the Golden Strip Preschool, in part because the limited hours afforded them the opportunity to utilize an in-home program for treating MM's autism (denominated as the "Lovaas" system).[8]

On September 21, 1995, MM's IEP Team, including her parents, met in Greenville. During this meeting, MM's 1995-96 IEP was com-

---

[5]Myotonic dystrophy is an inherited disease in which muscles can contract but have decreasing power to relax, causing them to become weak and waste away. Myotonic dystrophy can also result in mental deficiency.

[6]Autism adversely impacts the normal development of the brain in the areas of social interaction and communication skills. Individuals suffering from autism experience, inter alia, preoccupation with inner thoughts, daydreams, and fantasies, and they have difficulty communicating.

[7]The North Carolina IEP provided for MM to attend the Balfour Elementary Preschool in Hendersonville, North Carolina, and to receive the following educational services: (a) two four-and-one-half hour sessions of class time per week; (b) physical therapy for one-half hour per week; (c) speech therapy twice per week at one-half hour per session; and (d) occupational therapy once per month.

[8]The parents believe strongly in the Lovaas system, which is sometimes called "discrete trial training." Designed by a Dr. Lovaas, this system involves breaking down activities into discrete tasks and rewarding a child's accomplishments. The Lovaas system requires intensive parental involvement, early intervention, and treatment in the home and community, rather than solely in school.

pleted, and her parents accepted and signed the written IEP. This IEP placed MM in the Golden Strip Preschool one day per week, from 9:00 to 11:00 a.m., in a classroom with a four-to-one student-to-teacher ratio. The 1995-96 IEP also provided MM with one-half hour per week of speech therapy, one-half hour per week of physical therapy, and one-half hour per month of occupational therapy. MM's physical therapy took place before preschool hours, but her speech therapy occurred during school hours. The IEP did not, however, provide for Extended School Year Services ("ESY Services") for the Summer of 1996.[9] The 1995-96 IEP was then implemented as planned, and MM's parents did not object to it during the school year.

MM made educational progress during 1995-96, and she was then re-evaluated for the 1996-97 school year. On May 13, 1996, her IEP Team reconvened and discussed possible IEP placements for MM at both the Sara Collins Elementary School and the Golden Strip Preschool. The District preferred the Sara Collins placement, which included classroom services from 8:30 a.m. to 2:30 p.m., five days per week, plus two twenty-five-minute sessions of speech therapy per week, two thirty-minute sessions of physical therapy per week, and one thirty-minute session of occupational therapy per week. The Dis-

---

[9]ESY Services are organized educational programs designed for disabled children that occur outside the regular school year, e.g., summer programs. With regard to ESY Services, the Code of Regulations of the State of South Carolina provides that:

> The term "extended school year services" ("ESY Services") means special education and related services that are provided to a student with a disability beyond the normal school year of the school district/agency in accordance with the student's IEP, that are provided at no cost to the parent of the student, and that meet the standards of the State Department of Education. . . . ESY Services must be provided only if a student's IEP team determines on an individual basis that the services are necessary for the provision of a free appropriate public education (FAPE) to the student . . . .

24 S.C. Code Ann. Regs. § 43-243(C)(13). The regulations promulgated by the Department of Education to implement the IDEA require a school district to provide a disabled child with ESY Services when such services are necessary to provide a FAPE. 34 C.F.R. § 300.309.

trict's proposed 1996-97 IEP (the "Proposed 1996-97 IEP") did not contemplate providing MM with any ESY Services. Primarily because her parents desired that she spend more time in the Lovaas program, the IEP Team discussed placing MM at Golden Strip for another year. As a result of this IEP Team meeting, the District agreed to support the placement of MM at either Sara Collins or Golden Strip, but an IEP was neither signed nor agreed to for 1996-97.

On May 24, 1996, MM's parents requested reimbursement from the District for the in-home Lovaas program in which MM had been participating. A follow-up IEP Team meeting was then conducted on August 8, 1996, during which her parents presented their goals and objectives for MM, primarily based on her participation in the Lovaas program. This meeting was unsuccessful, and the Proposed 1996-97 IEP was not accepted by MM's parents.

Another IEP Team meeting was scheduled for August 22, 1996, but it was cancelled by the parents. An IEP was never finalized for 1996-97, and MM has not attended school in the District since May 1996. She has, however, continued to engage in the in-home Lovaas program, and she has attended kindergarten at a local Presbyterian Church. In preparing to offer an IEP for 1997-98, the District asked the parents for an opportunity to reassess MM, but they refused. The District did not make an IEP placement offer to MM for the 1997-98 school year.

On March 2, 1998, pursuant to the IDEA and § 43-243 of the South Carolina Code of Regulations, the Parents[10] requested a due process hearing regarding the 1995-96, 1996-97, and 1997-98 school years.[11]

---

[10]In this opinion, we refer to MM and her parents, the three plaintiffs in this case, collectively as the "Parents." In discussing her parents only, we continue to refer to them as the "parents."

[11]The issues presented at the hearing, according to the Hearing Officer, were as follows:

  A.  *For the Petitioners:*

    1.  FAPE - The appropriateness of the District's IEPs.

    2.  The District's ability to implement the proposed IEPs.

This hearing, conducted before a Hearing Officer in Greenville, lasted five days and included the testimony of twelve witnesses. The Hearing Officer thereafter concluded that the 1995-96 IEP and the Proposed 1996-97 IEP each were legally sufficient (i.e., they offered a FAPE), and that the District was not required to formulate an IEP for MM for the 1997-98 school year. He found, however, that the District had improperly failed to offer ESY Services to MM for the Summer of 1997, and he consequently ordered the District to pay $3,600 in reimbursement to the Parents. *DM & EM v. Sch. Dist.*, Due Process Hearing Pursuant to IDEA, Hearing Officer Decision (June 24, 1998) (the "Hearing Officer Decision").

The Parents thereafter appealed the Hearing Officer Decision to a Reviewing Officer of the South Carolina Department of Education, the second tier of the State's review process. 24 S.C. Code Ann. Regs. § 43-243. On October 2, 1998, the Reviewing Officer affirmed the Hearing Officer Decision on the legal sufficiency of the 1995-96 IEP and the Proposed 1996-97 IEP, and he concluded that no IEP was required for the 1997-98 school year. On the issue of ESY Services, however, the Reviewing Officer reversed the Hearing Officer, concluding that the District was not required to offer ESY Services for the Summer of 1997. *MM v. Greenville County Sch. Dist.*, Decision on Appeal from a Due Process Hearing (Oct. 2, 1998) ("Reviewing Officer Decision").

---

3. The Petitioners' desire for reimbursement for MM's private placement.

4. Compensatory education for MM.

5. The award of attorney's fees, costs and witness fees.

6. The award of actual and punitive damages.

B.   *For the School District:*

1. The assertion of the legal defense of Laches regarding any contest of the 1995-96 IEP because the Petitioners executed a document accepting it and did not raise any objection until the end of the school year.

2. The District had provided and offered FAPE for MM but it was rejected by the Petitioners.

On October 13, 1998, the Parents instituted this suit, seeking judicial review of the administrative decisions and asserting that the District had inappropriately failed to offer MM an IEP for the three school years after 1996-97. The parties thereafter filed cross-motions for summary judgment, and the court awarded summary judgment to the District for the school years 1997-98, 1998-99, and 1999-2000, concluding that the Parents had failed to exhaust their administrative remedies for each of those years. *MM v. Sch. Dist.*, No. 3:98-2971-17, Sealed Hearing Tr. at 37 (D.S.C. Feb. 22, 2000). The court then heard evidence on the issue of whether the District should have offered ESY Services to MM for the Summer of 1997. On August 17, 2000, it filed its Opinion, upholding the administrative rulings that the Proposed 1996-97 IEP was sufficient, and sustaining the Reviewing Officer's conclusion that the District was not obligated to offer ESY Services for the Summer of 1997. The district court reversed the Reviewing Officer on the 1995-96 IEP, however, concluding that it failed to provide MM with a FAPE. Opinion at 8. As a result of its rulings, the court awarded MM approximately $5,500 in damages. On August 18, 2000, the court entered judgment for those damages, and it also awarded MM nearly $2,000 in prejudgment interest. *MM v. Sch. Dist.*, Sealed Judgment in a Civil Case, C/A No. 3:98-2971-17 (D.S.C. Aug. 18, 2000). On February 6, 2001, the court, by separate order, awarded MM attorneys' fees and litigation expenses in the sum of over $42,000, but it held that her expert witness fees were not recoverable. *MM v. Sch. Dist.*, Order, C/A No.: 3:98-2971-17 (D.S.C. Feb. 6, 2001).

The District has timely appealed the district court's ruling that the 1995-96 IEP failed to provide MM with a FAPE. The Parents have cross-appealed, raising four issues. They contend that the court erred in deciding that: (1) the Proposed 1996-97 IEP offered MM a FAPE; (2) the Parents improperly failed to exhaust their administrative remedies for the school years 1997-98, 1998-99, and 1999-2000; (3) the District properly denied ESY Services to MM for the Summer of 1997; and (4) their expert witness fees were not recoverable costs under the IDEA.

## II.

While we generally review a summary judgment award de novo, our review process in the IDEA context warrants some explanation.

In a judicial proceeding under the IDEA, a reviewing court is obliged to conduct a modified de novo review, giving "due weight" to the underlying administrative proceedings. *Board of Educ. v. Rowley*, 458 U.S. 176 (1982); *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991) ("Generally, in reviewing state administrative decisions in IDEA cases, courts are required to make an independent decision based on a preponderance of the evidence, while giving due weight to state administrative proceedings."). In such a situation, findings of fact made in administrative proceedings are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why. *Doyle*, 953 F.2d at 105. The court is not, however, to "substitute [its] own notions of sound educational policy for those of local school authorities." *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 999 (4th Cir. 1997). In a two-tier administrative review situation, where a Hearing Officer and a Reviewing Officer have reached the same conclusion, a reviewing court is obliged to accord greater deference to their findings. *Combs v. Sch. Bd. of Rockingham County*, 15 F.3d 357, 361 (4th Cir. 1994).

Whether a district court has accorded the proper "due weight" to the administrative proceedings is a question of law — or at least a mixed question of law and fact — to be reviewed de novo by an appellate court. In our review, we need not defer to factual recitations made by a district court from the administrative record, because that court stands in no better position than do we in reviewing the record. *Cf. In re Shangra-La, Inc.*, 167 F.3d 843, 847 (4th Cir. 1999) ("We review the judgment of a district court sitting in review of a bankruptcy court de novo, applying the same standards of review that were applied in the district court."). In conducting our review in an IDEA proceeding, we therefore must examine the entire record, and we must afford "due weight" to the administrative determinations, applying the standard of review utilized by the district court. However, where a district court has heard and considered additional evidence, as occurred here in connection with the ESY Services issue, we review its findings of fact for clear error.[12] *See Tucker v. Calloway County*

---

[12]Pursuant to 20 U.S.C. § 1415(i)(2)(B)(ii), the district court, in an IDEA proceeding, "shall hear additional evidence at the request of a party." However, a district court may only award summary judgment to

*Bd. of Educ.*, 136 F.3d 495, 503 (6th Cir. 1998) (observing that, in IDEA case where district court received deposition testimony not in administrative record, "[w]e apply a clearly erroneous standard of review to the district court's findings of fact.").

### III.

In its appeal, the District has raised only one issue: it challenges the court's conclusion that MM's 1995-96 IEP failed to provide her with a FAPE. Because the dispute over the 1995-96 IEP is a substantive one, the district court properly framed the question as "whether the IEP was reasonably calculated to enable the child to receive educational benefits, or stated another way, was the IEP sufficient to confer 'some educational benefit' upon the handicapped child." Opinion at 6. The court noted that conflicting testimony had been presented to the Hearing Officer on whether the 1995-96 IEP was appropriate, but it decided that the "persuasive weight of the evidence" demonstrated that the 1995-96 IEP was not appropriate and that it did not provide MM with a meaningful educational benefit. *Id.* at 7. In reaching this conclusion, the court rejected the District's contention that it was accommodating the Parents' desire to have MM engage in the in-home Lovaas program, noting that the District "has not offered any authorities (nor a clear waiver) in support of its position that it may abdicate its responsibilities under the IDEA by relying on what parents are privately carrying out at home." *Id.* at 8 n.8. The court also rejected the findings of both the Hearing Officer and the Reviewing Officer, because they each focused on whether MM *actually* made progress based on the 1995-96 IEP, rather than on whether the IEP was "reasonably calculated" to lead to educational benefits. *Id.* at 9.

We have always been, and we should continue to be, reluctant to second-guess professional educators. As we observed in *Tice v. Bote-*

---

the extent that there are "no disputed issues of material fact." Fed. R. Civ. P. 56(c). In hearing additional evidence pursuant to § 1415(i)(2)(B)(ii), the court effectively acts as a fact-finder, rendering summary judgment an inappropriate procedure for resolution of that aspect of the case. Thus, to the extent the district court heard additional evidence on the ESY Services issue, it was essentially conducting a bench trial on that point, and we review its fact finding for clear error.

*tourt County School Board*, 908 F.2d 1200, 1207 (4th Cir. 1990), "once a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second-guess the judgment of education professionals." Indeed, we should not "disturb an IEP simply because we disagree with its content," and we are obliged to "defer to educators' decisions as long as an IEP provided the child the basic floor of opportunity that access to special education and related services provides." *Id.* (internal citation and quotations omitted).

In their consideration of the District's actions with respect to MM, both the Hearing Officer and the Reviewing Officer found that the 1995-96 IEP provided her with a FAPE. The district court rejected these conclusions, and it instead determined that "[t]he brevity of this program — just a few hours one day a week, with no instruction the remaining four and one-half days per week — was . . . in this court's judgment, completely inadequate." Opinion at 8. In reaching its decision, the court failed to consider the actual educational progress made by MM during 1995-96, even though an important measure of an IEP's success is whether the disabled child has made progress on the basis of objective criteria. *See Rowley*, 458 U.S. at 207 n.28 (observing that "achievement of passing marks and advancement from grade to grade" are an "important factor in determining educational benefit").

The district court, in assessing whether MM's 1995-96 IEP constituted a FAPE, failed to consider and accord weight to her actual educational progress.[13] And in these cases, the courts should endeavor to

---

[13]In rejecting the objective evidence of MM's actual progress, the district court concluded that such evidence could not demonstrate the appropriateness of the 1995-96 IEP, because it was "highly likely that the progress MM experienced was due in large part to" private in-home instruction. Opinion at 9. Although some of MM's progress could have been attributable to in-home instruction, there was no showing that her progress was "in large part" brought about by this private instruction, rather than by the IEP. While the evidentiary value of MM's actual progress would be diminished if it was substantially attributable to in-home instruction, there has been no such showing. The district court speculated, without any record support, that the in-home instruction accounted for *all* of MM's progress. We are, on such reasoning, unable to accept the proposition that MM's actual progress fails to support the adequacy of her 1995-96 IEP.

rely upon objective factors, such as actual educational progress, in order to avoid "substitut[ing] [our] own notions of sound educational policy for those of the school authorities which [we] review." *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 1000 (4th Cir. 1997) (internal citation and quotation omitted). In refusing to credit such evidence, and in conducting its own assessment of MM's IEP, the court elevated its judgment over that of the educators designated by the IDEA to implement its mandate. The courts should, to the extent possible, defer to the considered rulings of the administrative officers, who also must give appropriate deference to the decisions of professional educators. As we have repeatedly recognized, "the task of education belongs to the educators who have been charged by society with that critical task . . . [and] federal courts must accord due weight to state administrative proceedings." *Springer by Springer v. Fairfax County Sch. Bd.*, 134 F.3d 659, 663 (4th Cir. 1998) (internal quotation omitted). Because the district court, in vacating the administrative rulings on MM's 1995-96 IEP, failed to appropriately defer to the professional educators, we reverse its award of summary judgment on that issue.[14]

## IV.

Turning to the cross-appeal, the Parents raise four separate contentions of error. They maintain that (1) the Proposed 1996-97 IEP was both procedurally and substantively defective; (2) the court improperly awarded summary judgment to the District for the years 1997-98, 1998-99, and 1999-2000 on the ground that the Parents failed to exhaust administrative remedies; (3) the court erroneously denied

---

[14]The district court also rejected the District's contention that the Golden Strip placement in the 1995-96 IEP was an effort to accommodate the parents, who wished to offer MM the in-home Lovaas program. As the Sixth Circuit has observed, a parent may "naturally" not "use the fact that the District complied with their wishes as a sword in their IDEA action." *Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss*, 144 F.3d 391, 398 (6th Cir. 1998) (referring to parental request to defer development of IEP until November). As a general matter, it is inappropriate, under the IDEA, for parents to seek cooperation from a school district, and then to seek to exact judicial punishment on the school authorities for acceding to their wishes.

ESY Services to MM for the Summer of 1997; and (4) the court erred in declining to order reimbursement for expert witness fees. We address each of these issues in turn.

### A.

### 1.

First of all, the Parents maintain that the Proposed 1996-97 IEP was incomplete, and thereby procedurally defective, because it was not finalized by the beginning of the school year, as mandated by the IDEA. *See* 20 U.S.C. § 1414(d)(2)(A) ("At the beginning of each school year, each local educational agency . . . shall have in effect, for each child with a disability in its jurisdiction, an individualized education program . . . ."). And it is possible for a school district's failure to abide by the IDEA's procedural requirements to constitute an adequate basis for contending that the district has failed to provide a disabled child with a FAPE. *Board of Educ. v. Dienelt*, 843 F.2d 813, 815 (4th Cir. 1988).

It is clear that, under the IDEA, the failure of a school district to have a final IEP in place at the beginning of a school year is a procedural defect. When such a procedural defect exists, we are obliged to assess whether it resulted in the loss of an educational opportunity for the disabled child, or whether, on the other hand, it was a mere technical contravention of the IDEA. *Gadsby v. Grasmick*, 109 F.3d 940, 956 (4th Cir. 1997) ("[T]o the extent that the procedural violations did not actually interfere with the provision of a free appropriate public education, these violations are not sufficient to support a finding that an agency failed to provide a free appropriate public education."). If a disabled child received (or was offered) a FAPE in spite of a technical violation of the IDEA, the school district has fulfilled its statutory obligations. *Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 982 (4th Cir. 1990) ("[The child] has benefitted educationally from the instruction provided under the Board's IEP. Federal law requires no more.") (internal citation omitted).

It is undisputed that the Proposed 1996-97 IEP for MM was never signed or completed. It is also undisputed that MM's parents attended two IEP Team meetings regarding the Proposed 1996-97 IEP, and

that they cancelled a scheduled third meeting. The District then requested notification from the parents when they were ready to reconvene the IEP Team. The parents provided no such notification, however, nor did they ever respond to the written notice from the District that a space was being held open for MM for the 1996-97 school year.

In their appeal, the Parents rely on a Sixth Circuit decision, *Knable v. Bexley City School District*, in maintaining that a "draft" or proposed IEP cannot satisfy the IDEA, and that the District's failure to complete MM's 1996-97 IEP entitles them to reimbursement. 238 F.3d 755 (6th Cir. 2001). They also rely on the First Circuit's decision in *Town of Burlington v. Department of Education*, and they defend their failure to reschedule the IEP Team meeting by asserting that the District is obligated to complete an IEP, whether a child's parents cooperate or not. 736 F.2d 773, 795 (1st Cir. 1984). These authorities, however, fail to support the propositions advanced by the Parents.

In *Knable*, the Sixth Circuit declined to address whether a "draft" IEP could be sufficient to comply with the IDEA because, in that case, the school district had *never* convened an IEP Team meeting, a prerequisite to a valid IEP. 238 F.3d at 766-67. In *Burlington*, the First Circuit concluded that the school district had failed to properly notify the child's parents of an IEP Team meeting. The court rejected the district's excuse for failure to notify — that the parents had refused to make the disabled child available for evaluation — because a child need not be present at an IEP Team meeting. 736 F.2d at 795. Because the district failed to provide notice to the child's parents of the IEP Team meeting, it failed to comply with the procedures established by the IDEA regulations. *Id.*; 34 C.F.R. § 300.504.[15]

---

[15]Additionally, the Parents rely on our decision in *Board of Education of County of Cabell v. Dienelt*, 843 F.2d 813 (4th Cir. 1988), for the proposition that a FAPE has been denied when the school district fails to conduct an IEP review, regardless of whether the child's parents were adversarial. In *Dienelt*, however, we concluded that the district had committed grievous procedural errors, and that "the public schools did not conduct a placement advisory committee meeting or otherwise adequately involve the Dienelts in the preparation of [the child's] proposed IEP." 843 F.2d at 815. This situation is materially different, in that MM's parents were fully advised of the proceedings regarding MM, and they were afforded an adequate opportunity to participate as a member of her IEP Team.

Unlike the factual underpinnings of *Knable* and *Burlington*, the administrative decisionmakers in this case, and the district court as well, found that the District was willing to offer MM a FAPE, and that it had attempted to do so. They also found that her parents had a full opportunity to participate in the development of the Proposed 1996-97 IEP. The court's analysis emphasized that the parents had been afforded a full and fair involvement in the process. *Spielberg v. Henrico County Pub. Sch.*, 853 F.2d 256, 259 (4th Cir. 1988). Indeed, the court properly concluded that "it would be improper to hold [the] School District liable for the procedural violation of failing to have the IEP completed and signed, when that failure was the result of [the parents'] lack of cooperation." Opinion at 15.

It is significant that there is no evidence that MM's parents would have accepted any FAPE offered by the District that did not include reimbursement for the Lovaas program. As we have noted, the District is not obligated by the IDEA to provide a disabled child with an optimal education; it is only obliged to provide a FAPE. *Rowley*, 458 U.S. at 192. In these circumstances, MM suffered no prejudice from the District's failure to agree to her parents' demands. Because this procedural defect did not result in any lost educational opportunity for MM, the Proposed 1996-97 IEP did not contravene the IDEA.

2.

In their appeal, the Parents also contend that the Proposed 1996-97 IEP was substantively deficient, and that their lack of cooperation with the District is thus excused. In this regard, the Hearing Officer found otherwise, concluding that "[t]here is no reason to doubt that [MM] would have made progress and received meaningful educational benefit from the Sara Collins placement." Hearing Officer Decision at 13. Although the Hearing Officer thought it "less certain" that the Golden Strip placement would have provided educational benefit, he concluded that "the District should not be penalized because they were attempting to honor the requirements of I.D.E.A. which encourage parental participation in the education of their children." *Id*. The Reviewing Officer later found that the Proposed 1996-97 IEP "was an enhancement over the successful IEP delivered by the District in [the] 1995-96 school year. There is no evidence that MM would not have benefitted from participation in that program."

Reviewing Officer Decision at 13. Likewise, the district court concluded that the Proposed 1996-97 IEP "could have conferred educational benefit," and that it thus complied with the mandate of the IDEA. Opinion at 17.

We have no basis, on this record, for overturning the consistent decisions of the administrative and judicial process. The Hearing Officer, the Reviewing Officer, and the district court each reached the same conclusion — that the Proposed 1996-97 IEP for MM was substantively appropriate.

### B.

The Parents next challenge the District's failure to develop an IEP for MM for the school years 1997-98, 1998-99, and 1999-2000. The district court awarded summary judgment to the District with respect to each of these years, concluding that the Parents had failed to exhaust their available administrative remedies. *MM v. Sch. Dist.*, No. 3:98-2971-17, Sealed Hearing Tr. at 37 (D.S.C. Feb. 22, 2000).

### 1.

First of all, it is undisputed that, for the school years 1998-99 and 1999-2000, the Parents failed to request a due process hearing. The Parents claim, however, that they were not, in this situation, obliged to make any such request and thereby exhaust their administrative remedies. Their basis for this assertion is that the District was engaged in a continuing violation of the IDEA, and that they were therefore not required to "re-exhaust" for each year.

It is clear that, under the IDEA, parents asserting a violation of the IDEA must first request a due process hearing. 20 U.S.C. § 1415(f). The courts have recognized only three narrow exceptions to this exhaustion requirement, each arising largely out of the legislative history of the IDEA: (1) when the administrative process would have been futile; (2) when a school board failed to give parents proper notification of their administrative rights; or (3) when administrative exhaustion would have worked severe harm upon a disabled child. *See, e.g.*, *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1303-04

(9th Cir. 1992); *Koster v. Frederick County Bd. of Educ.*, 921 F. Supp. 1453, 1455 (D. Md. 1996). None of these exceptions applies to the circumstances here.

In this appeal, the Parents challenge the lack of IEPs for three separate academic years. When parents of a disabled child challenge multiple IEPs in court, they must have exhausted their administrative remedies for *each academic year* in which an IEP is challenged.[16] *See, e.g.*, *Devine v. Indian River County Sch. Bd.*, 249 F.3d 1289, 1292 n.2 (11th Cir. 2001). And these Parents were not uninformed: because they appealed the IEPs for other years in the proper manner, i.e., 1995-96 and 1996-97, "it is clear that they were aware of the availability of such review." *Dreher v. Ampitheater Unified Sch. Dist.*, 22 F.3d 228, 235 (9th Cir. 1994). The failure of the Parents to exhaust their administrative remedies for the 1998-99 and 1999-2000 school years deprives us of subject matter jurisdiction over those claims, and we agree with the district court that the claims for those years must fail.

2.

On the other hand, the circumstances of the 1997-98 school year are different. The Parents challenged the District's failure to develop an IEP for the 1997-98 school year at the due process hearing, and they maintained that position before the Reviewing Officer. The district court was therefore incorrect in concluding that the Parents had failed to exhaust their administrative remedies for the 1997-98 school year.

Nonetheless, we are entitled to affirm the court's judgment on alternate grounds, if such grounds are apparent from the record. *See, e.g.*, *Cochran v. Morris*, 73 F.3d 1310, 1315 (4th Cir. 1996) (noting "well-recognized authority of courts of appeals to uphold judgments of district courts on alternate grounds"). In that regard, the Reviewing Officer concluded that the District had engaged in a good-faith effort

---

[16]The unilateral decision of the Parents to remove MM from the District's schools does not excuse their failure to exhaust their administrative remedies. *N.B. v. Alachua County Sch. Bd.*, 84 F.3d 1376, 1379 (11th Cir. 1996); *Doe v. Smith*, 879 F.2d 1340, 1343 (6th Cir. 1989).

to offer MM a FAPE for the 1997-98 school year. Reviewing Officer Decision at 15 ("The School District should not be held liable for the Petitioners lack of effort to comply with the Districts' [sic] request to evaluate MM before designing and offering a FAPE program for the 1997-98 school year."). Indeed, the District had specifically offered to re-evaluate MM for 1997-98, and it had indicated a willingness to develop an IEP for 1997-98. It is undisputed, however, that after the Summer of 1996, the Parents refused to cooperate with the District.

A school district is only required to continue developing IEPs for a disabled child no longer attending its schools when a prior year's IEP for the child is under administrative or judicial review. *See Amann v. Stow Sch. Sys.*, 982 F.2d 644, 651 n.4 (1st Cir. 1992); *Burlington*, 736 F.2d at 794. Even if a prior year's IEP is contested and the school district fails to develop subsequent-year IEPs, "the losing party in the dispute over the contested IEP . . . will have the *burden of producing evidence and persuading the court of changed circumstances* that render the district court's determination as to the initial year inappropriate for guiding its order of relief for subsequent years." *Anderson v. Dist. of Columbia*, 877 F.2d 1018, 1022 (D.C. Cir. 1989) (quoting *Burlington*, 736 F.2d at 795) (emphasis in original).

In this case, the parents withdrew MM from the District's schools in 1996, but they did not request a due process hearing as to *any* IEP until March of 1998. The District was therefore under no continuing obligation in 1997 to develop an IEP for MM. Even if the District had been so obliged, the Parents have made no showing of changed circumstances. Because the District was not obliged to develop an IEP for MM for the 1997-98 school year, we will affirm, on this alternate ground, the award of summary judgment to the District on the 1997-98 IEP.

## C.

The third contention of the Parents in their cross-appeal is that the district court erroneously determined that MM was not entitled to ESY Services for the Summer of 1997. While the Hearing Officer had initially concluded that MM was entitled to ESY Services (Hearing Officer Decision at 14), the Reviewing Officer reversed that decision. Reviewing Officer Decision at 13-14. The district court, after review-

ing the findings of the Hearing Officer and the Reviewing Officer, and after hearing additional testimony not before those administrative officials, concluded that MM was not entitled to ESY Services. Opinion at 20.

We have not developed a standard for determining when ESY Services are appropriate under the IDEA. However, the Fifth and Tenth Circuits have concluded that ESY Services are appropriate when the benefits accrued to a disabled child during a regular school year will be significantly jeopardized if he is not provided with an educational program during the summer months. *Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ.*, 790 F.2d 1153, 1158 (5th Cir. 1986); *see also Johnson v. Indep. Sch. Dist. No. 4*, 921 F.2d 1022, 1028 (10th Cir. 1990). The Sixth Circuit, in a slightly different characterization, has held that ESY Services are warranted when they prevent significant regression of skills or knowledge that would seriously affect a disabled child's progress toward self-sufficiency. *Cordrey v. Euckert*, 917 F.2d 1460, 1474 (6th Cir. 1990). In this case, the district court properly characterized the standards utilized by those courts as being similar to one another, and it amalgamated them into a single test. Opinion at 19 (requiring that "plaintiff would have to establish that ESY would prevent significant regression of skills or knowledge retained by the child so as to seriously affect his progress toward self-sufficiency, or that benefits accrued to the child during the regular school year would be significantly jeopardized if he were not provided an educational program during the summer."). Applying this test, the court held that the Parents had failed to establish any entitlement to ESY Services for the Summer of 1997.[17]

ESY Services are only necessary to a FAPE when the benefits a disabled child gains during a regular school year will be significantly jeopardized if he is not provided with an educational program during the summer months. We have observed that "[t]he determination

---

[17]We agree with the court's rejection of the District's position that the child must *actually* regress during the summer before ESY Services must be offered. This "Hobson's choice" has wisely been rejected by other courts, because parents should not be compelled to watch their disabled child regress in order to qualify for ESY Services. *See, e.g.*, *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 184 (3d Cir. 1988).

whether services beyond the regular school day are essential for the child to receive any educational benefit is necessarily fact and case specific." *Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 980 (4th Cir. 1990). Because a showing of actual regression is not required, a disabled child's need for ESY Services may be established by expert testimony, based on a professional individual evaluation. However, the mere fact of likely regression is not a sufficient basis, because all students, disabled or not, may regress to some extent during lengthy breaks from school. ESY Services are required under the IDEA only when such regression will substantially thwart the goal of "meaningful progress." *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 184 (3d Cir. 1988).

On this question, the district court considered the conflicting administrative findings of the Hearing Officer and the Reviewing Officer. Perhaps because of the conflict, the court, as it was entitled to do under 20 U.S.C. § 1415(i)(2)(B)(ii), then heard and considered testimony from both MM's mother and a pediatric physical therapist. The evidence presented in the district court was conflicting: during 1999, MM regressed when a few sessions were missed over a three-week period, but she did not regress when she missed a greater number of sessions in 1998. Based on this additional evidence, as well as on its review of the administrative proceedings, the court found that the Parents had failed to demonstrate that the "benefits accrued to the child during the regular school year would be significantly jeopardized if MM were not provided an educational program during the summer." Opinion at 20.

Because the district court heard and considered additional evidence, we review its findings on the ESY Services issue for clear error. *See supra* note 12. In light of the conflicting evidence and the administrative decisions, the district court's finding, that the Parents had failed to demonstrate that MM's progress would be significantly jeopardized in the absence of ESY Services, cannot be clearly erroneous. *See, e.g.*, *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Corp.*, 65 F.3d 1113, 1122 (4th Cir. 1995) ("Given the conflicting nature of the evidence in the record, we cannot reverse the district

court's finding as clearly erroneous."). As such, we must affirm its denial of reimbursement to the Parents for ESY Services.[18]

## V.

Pursuant to the foregoing, we reverse the district court on the 1995-96 IEP. We affirm its rulings that the Proposed 1996-97 IEP provided a FAPE, that summary judgment was appropriate for the school years 1997-98, 1998-99, and 1999-2000, and that the District was not required to offer ESY Services to MM for the Summer of 1997. We remand for such further proceedings, if any, that might be appropriate.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*

---

[18]The Parents also maintain that their expenditures on expert witness fees are recoverable costs under the IDEA. Given our disposition of the preceding issues, however, the Parents are not a "prevailing party" in this controversy, and their contention as to fees is moot. *See* 20 U.S.C. § 1415(i)(3)(B) ("In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party.").