COUNTY SCHOOL BOARD
OF HENRICO COUNTY,
VIRGINIA, Plaintiff,

v.

R.T., a minor, et al., Defendants.

No. CIV.A. 3:04CV923.

United States District Court,
E.D. Virginia.
Richmond Division.

May 26, 2006.

See, also, 2006 WL 1647395, 433 F.Supp.2d 692.

J. Thomas Tokarz, II, Esquire, Joseph P. Rapisarda, Jr., Esquire, Henrico County Attorney's Office, Kathleen S. Mehfoud, Esquire, Reed Smith LLP, Richmond, VA, for Plaintiff.

Adrienne E. Volenik, Esquire, Mental Disabilities Law Clinic–T.C., Williams School of Law, University of Richmond, William H. Hurd, Esquire, E. Paige Selden Fitzgerald, Esquire, Siran S. Faulders, Esquire, Troutman Sanders LLP, Richmond, VA, for Defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

The County School Board or Henrico County, Virginia ("School Board") filed this action under 20 U.S.C. § 1415(i)(2)(A), seeking reversal of a State Hearing Officer's decision of December 29, 2003 in the matter of *Henrico County Public Schools v. R.T.*, a minor, *et al.* (Attachment A to Complaint, Docket No. 1). In the December 29, 2003 decision, the State Hearing Officer held that the School Board had failed to provide RT, a student eligible for services under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1411 *et seq.* (2000 ed. & Supp.),[1] with a "free appropriate public education" as required by the IDEA, § 1415(a)(1)(A), and governing decisional law. The question presently before the Court is whether, based on the record developed in the administrative hearing, the parents proved that the November 4, 2002 individualized education plan designed for RT and rejected by RT's parents ("the parents"), was not "reasonably calculated to provide educational benefit" to RT for the 2002–2003 school year. *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (establishing the standard by which to judge an IEP). Based on the findings of fact and conclusions of law set forth below, the Court finds that the parents have met their burden and judgment will be entered in their favor.

## I. The IDEA

The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." § 1400(d)(1)(A). To achieve this purpose, the IDEA extends federal funding to the States to provide disabled schoolchildren with a "free appropriate public education" ("FAPE"). § 1412(a)(1)(A). A FAPE is provided by school districts in public schools in the so-called "least restrictive environment"—*i.e.* the educational environment suitable for the disabled student that is most similar to the public school environment in which non-disabled children are educated. § 1412(a)(5); *Schl. Bd. of Prince William County v. Malone*, 762 F.2d 1210, 1213 (4th Cir.1985). However, where the public school district is unable to provide a FAPE in the public schools, the IDEA requires that the school districts shall assume the cost of educating the child in a private school that meets the child's educational and social services needs. § 1412(a)(10)(B).

A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child... supported by such services as are necessary to permit the child to benefit from the

---

1. Hereinafter all statutory citations are to Chapter 20 of the United States Code, 2000 ed. & Supp., unless otherwise noted.

instruction." *Rowley*, 458 U.S. at 188–89, 102 S.Ct. 3034 (internal quotation marks omitted). A FAPE is implemented through an individualized education plan ("IEP"), which is designed by an IEP team, consisting of school district educators and administrators, education experts, and, of vital importance, the child's parents. IEPs "must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." *MM ex rel. DM v. Schl. Dist. of Greenville County*, 303 F.3d 523, 527 (4th Cir.2002); *see* § 1414(d)(1)(A).

The IDEA establishes detailed procedures for IEP development and review. If a dispute arises over the sufficiency of an IEP, the statute requires the parents to notify the school district of their complaints, enter into mediation, and, if that is not successful, allows the parents to bring a due process action before an impartial state or local administrative hearing officer. §§ 1415(a), (b)(7), (e), (f). A party aggrieved by the decision of the hearing officer may file a civil action in a state or federal district court. § 1415(i)(2).

■ To provide an "appropriate" education within the meaning of the IDEA, the school district does not have to provide the child

> with the best possible education. And, once a FAPE is offered, the school district need not offer additional educational services. That is, while a state must provide specialized instruction and related services sufficient to confer some educational benefit upon the handicapped child, the Act does not require the furnishing of every special service necessary to maximize each handicapped child's potential.

*MM*, 303 F.3d at 526–27 (citations and internal quotation marks omitted). However, "Congress did not intend that a school system could discharge its duty under the [Act] by providing a program that produces some minimal academic advancement, no matter how trivial." *Hall ex rel. Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 636 (4th Cir.1985). Setting the substantive standard, the Supreme Court has stated that an IEP is sufficient if it is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034. In this action, the Court must assess, based on the applicable standard of review, whether the November 4, 2002 IEP was "reasonably calculated to enable [RT] to receive educational benefits." *See Rowley*, 458 U.S. at 207, 102 S.Ct. 3034.

## II. Chronology Of Events

It will helpful to set forth a chronology of events in this matter. This chronology constitutes facts, largely uncontested by the parties, and found by the Court by a preponderance of the evidence.

RT was born on March 27, 1998. He and his mother and father, CMT and RCT, now reside in Henrico County, Virginia. In late 1998, the parents first noticed that RT was developmentally delayed. After being referred to the Chesapeake Center, an organization that specializes in identifying and addressing early childhood developmental disorders, RT began receiving speech and occupational therapy through the Center under an Individualized Family Services Plan prepared by the Henrico Area Mental Health and Retardation Services' Parent–Infant Program.

In October 1999, Ronald B. David, M.D., a pediatric neurologist, identified RT as a child with autism disorder and language delays. Autism is recognized as a disability under the IDEA. In a January 2000 evaluation of RT, the Chesapeake Center

found that RT had language delays and disorders in language, gestures, play and interaction skills. A March 2000 study by Henrico County found that RT had "significant communication and oral motor difficulties" and his receptive and expressive language, cognitive performance and speech production "were below average." (School Board's Exh. 24.) (hereinafter "(SB-# .)").

In the Spring of 2000, Henrico County Public Schools ("HCPS") identified RT as a student in need of special education services. Thereafter, pursuant to an IEP written in April 2000, RT began receiving homebound services from HCPS in speech and occupational therapy. In September 2001, RT entered Henrico County's Pre–School Education For Developmentally Delayed ("PEDD") program taught at Maybeury Elementary School by Patricia Nelson. With six or seven children and one teacher, the PEDD program involved both group and individual-based education methods. During the program, RT had several IEPs. (Defs.'s Exh. at 26–30.)

During RT's year in the PEDD program, RT's mother, Mrs. T., began to be concerned that RT was not progressing sufficiently. She felt that the short term goals set for the 2001–2002 school year still had not been met mid-way through the PEDD program. She sought to have RT admitted to the autism program at Twin Hickory Public Elementary School for the 2002–2003 school year.

In addition, after hearing about applied behavioral analysis or "ABA" therapy, a therapy that has proved effective in educating children with autism, Mrs. T. began intensively researching ABA therapy. In the spring of 2002, she endeavored to design a home ABA program for her son. Mrs. T. enlisted the assistance of Amanda Adkins, a 2002 graduate of the University of Virginia who had spent two years during college and one year after college doing in-home ABA therapy to develop and implement an in-home ABA program. The two women conducted the program in RT's home during the summer of 2002.

In September 2002, an IEP team convened to design an IEP for RT's education at Twin Hickory. The team agreed upon the so-called "September 2002 IEP," and RT began at Twin Hickory on September 9, 2002. The September 2002 IEP was essentially the same as RT's previous IEP, written in April 2002, except that RT moved from the PEDD program to the Program for Children with Autism at the Twin Hickory school. That program used a method of instruction known as TEACCH, a group-based education method which will be discussed in greater detail below. At the September 2002 IEP meeting, Mrs. T. presented research that she had done on ABA therapy, outlined the progress that she believed RT had made under that mode of instruction over the summer, and requested that ABA therapy be included in the IEP. The September IEP noted that request, but rejected it with the comment that RT was to be continued using his existing IEP goals under the TEACCH program at Twin Hickory until a re-evaluation of his present level of performance could be accomplished.

In the summer of 2002, the parent's believed that RT had not made progress in the PEDD program and was not likely to make progress in the TEACCH program at Twin Hickory. So, at the same time that they worked to develop the September IEP, the parent's began applying for RT to attend the Faison School, a private specialty school for autistic and developmentally delayed children that employs ABA therapy and that is run in conjunction with the Autism Center of Virginia at Virginia Commonwealth University. After RT was accepted to the Faison School, but

before he enrolled there, the Faison School sent Carrie Anne St. Amand, one of its employees, to provide additional support in RT's home ABA program.

Leading up to IEP meetings held on October 30 and November 4, 2002, both the parents and the School Board conducted evaluations of RT. As a result of testing, observation, and examination, a consensus developed among experts and educators that RT suffered from significant cognitive impairment in addition to autism. However, because of RT's young age and his lack of communication skills, the extent of RT's cognitive impairment could not be calculated accurately.

At the October/November IEP meetings, Mrs. T. expressed her desire that RT receive one-on-one instruction as is provided in ABA therapy and that RT have an extended school year program, (i.e. that he go to school year round). Mrs. T. presented a letter from Dr. Mary Megson, a developmental pediatrician whose practice involves treating children with autism, stating that, using ABA therapy, Dr. Megson had seen the reversal of autistic symptoms in RT and that 40 hours of ABA therapy was medically necessary for RT.

After the October 30th meeting, Dara Butler, the teacher of the autism program at Twin Hickory, drafted a new IEP. The team met again on November 4, 2002 to go over the new draft IEP ("The November IEP"). Mrs. T. testified, and the School Board agrees, that seventeen of the twenty-four November IEP goals were the same goals as had been listed on both the April 2002 and September 2002 IEPs. Mrs. T. testified that, considering that RT had not mastered those existing goals in his year in the PEDD program, she did not see how he would do so in the new program, which, with minor deviation, was the same as the PEDD program. She had hoped that the November IEP would change the method of learning and provide more one-on-one education than group-based education.

Convinced that the November IEP was not appropriate and frustrated with the School Board's refusal to provide RT with ABA style education, the parents gave the School Board the requisite ten days notice that they would be removing RT to the Faison School. On November 13, 2002, the parents visited Twin Hickory and observed RT in his educational setting. They were greatly troubled by what they observed there. The following day they transferred RT to the Faison School. Soon thereafter, the parents filed for a due process hearing under the IDEA and informed the School Board that they sought reimbursement for the cost of the Faison School because the School Board had failed to meet its responsibilities under the IDEA and related state law.

RT attended the Faison School for the remainder of the 2002–2003 school year. The due process hearing was held on August 15, 18, and 19, 2003. RT returned to the Faison School for the 2003–2004 school year, and he remained there after the hearing officer's decision on December 19, 2003 and for the rest of the 2003–2004 school year. By the time that the 2004–2005 school year began, the School Board had not acted to appeal the hearing officer's decision. So, RT enrolled at the Faison School for the start of that year, and remained there during this litigation until March 20, 2006, when his placement changed pursuant to an agreement between the parents and the School Board.

During the due process hearing, the parties presented extensive testimony. The parents presented testimony from five witnesses:

(1) Jane Carlson, Ph.D., then the Clinical Director at the May Center for Edu-

cation and Vocational Services. Dr. Carlson has a Ph.D. in clinical psychology from the University of New York at Stony Brook, spent twelve years at the National Research and Training Center on Positive Behavioral Support, was the Director of the Faison School when RT attended there, and has taught and published widely on autism and autistic education.

(2) Amanda Adkins, a University of Virginia graduate who assisted in developing and implementing RT's home ABA program.

(3) Carrie Anne St. Amand, who taught RT at the Faison School. Ms. St. Amand has a masters in education from Simmons College, completed a two year post-masters program in ABA Therapy, taught for at least six years at the New England Center for Children, and then worked at the Faison School.

(4) Donald Oswald, Ph.D., a licensed clinical psychologist. Dr. Oswald is an Associate Professor of Psychiatry at Virginia Commonwealth University and the Director of the Developmental Disorders Assessment Clinic at VCU. He began his career working with autistic students at a specialty school, became that school's administrator, thereafter opened the first residential home for autistic adolescents in Virginia, spent a year training at the Yale Child Study Center, currently spends fifty percent of his outpatient clinical practice time doing diagnostic evaluations, and has published numerous studies and articles on child autism, autistic education, and other developmental disorders.

(5) Julie Rusyniak, who was then the Program Coordinator for the Faison School. Ms. Rusyniak completed masters work in rehabilitation therapy and special education, is certified in behavior analysis, has worked with autistic children and adults since 1985 as an administrator, teacher, program designer, residential services provider, and as a trainer of other special education teachers.

(6) Dawn Hendricks, then the Administrative Director of the Faison School and also a Program Coordinator there. She completed masters work in special education with an endorsement from Virginia for education of the mentally retarded, is TEACCH certified, has opened several programs for children with autism and other disabilities in the public schools, and, at the time of the hearing, had worked with autistic and developmentally delayed children for eleven years.

(7) Mrs. T., mother of RT, who researched and trained herself about autism and applied behavior analysis (ABA) therapy.

The School Board's presented the testimony of five witnesses.

(1) Karen Swink, a speech pathologist with the Henrico County Public Schools. Dr. Swink received her Ph.D. in speech and hearing sciences from University of North Carolina–Chapel Hill in 1981 and an undergraduate degree in speech pathology from Mississippi University for Women, and, at the time of the hearing, had worked as a speech pathologist for twenty one years, eighteen of which were with HCPS.

(2) Dara Butler, the teacher of the Twin Hickory autism program. Ms. Butler received a masters of teaching in special education in 2000, is TEACCH certified, and, at the time of the hearing, had taught in schools for autistic children for three years.

(3) Patricia Nelson, the teacher in Maybeury's PEDD program. Ms. Nelson has a masters in early childhood special education from Virginia Commonwealth University, and has worked for the last fifteen

years in special education in Virginia public schools.

(4) Barbara Driver, Ph.D., the Director of Exceptional Education for HCPS. Dr. Driver received her Ph.D. in 2000 in education policy, planning and leadership with an emphasis on special education from the College of William and Mary, has a masters degree in education in curriculum and instruction with an emphasis on special education, teaches at several universities, has published and spoken widely on special education, and has been a learning disabilities specialist for over twenty years.

(5) Julie Szarko, Ph.D., a school psychologist with HCPS. Dr. Szarko received a Ph.D. in 2000 and masters degree in 1996 in school psychology from Pennsylvania State University, has worked as an autism consultant in HCPS, is TEACCH certified, and has published and spoken at regional conferences on special education.

Although state law requires a decision to be entered within forty five days,[2] the Hearing Officer did not file his decision until December 29, 2003. The Hearing officer found that the November IEP did not provide RT with an appropriate education, and that the Faison School provided an appropriate education.

With only a few days remaining in the one year appeal period, the School Board filed this action seeking reversal of the Hearing Officer's decision. The parents filed a counterclaim (Docket No. 16) asking this Court to uphold the Hearing Officer's decision and to order the School Board to pay the parents during the pendency of this litigation, *i.e.* on a *pendente lite* basis, for the costs of educating RT at the Faison

School. The parties each then filed motions for summary judgment (Docket Nos. 28 and 31) seeking a ruling on whether the IDEA entitled the parents to *pendente lite* payment, an issue the Fourth Circuit has not yet addressed.

At the parties' suggestion, the Court bifurcated the proceedings; hearing argument on the cross-motions for summary judgment first[3] and then proceeding to the merits of the case. The cross-motions for summary judgment were heard and subsequent briefing was required. Those motions are disposed of in a separate Memorandum Opinion, 2006 WL 1647395, 433 F.Supp.2d 692. This Memorandum Opinion addresses the merits of the case.

## III. Autism, TEACCH and ABA

Resolution of the issues presented in this case requires a basic explanation of the record that was developed on autism and the two methods of teaching autistic students like RT that are discussed in the record. The preponderance of the record evidence establishes the following facts on those topics.

### A. Autism

Often called Autism Spectrum Disorder, "[a]utism is a syndrome—a collection of symptoms, with different children experiencing distinct symptoms with varying degrees of impairment from their symptoms." Bryna Siegel, Ph.D., *Behavioral and Educational Treatments for Autism Spectrum Disorder*, Advocate 22, Nov.—Dec.2000 (hereinafter "Siegel") (SB–3). The Code of Federal Regulations defines autism as:

---

**2.** 8 VAC 20–80–76(L)(1).

**3.** Because, in its cross-motion, the School Board attacked the validity of Federal Regulations found at 34 C.F.R. 300.514, the Court deemed it necessary to invite the United

States to file a brief as *amicus curiae*. This extended the briefing schedule and extended the duration of this already protracted litigation.

a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age 3, that adversely affects a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences.

34 C.F.R. § 300.7(c)(1)(i). The symptoms of autism often are measurable by the time a child is 18 months to two years old. *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F.3d 877, 883 (9th Cir.2001) (citing Nat'l. Research Council, *Educating Children With Autism* 9, Catherine Lord & James P. McGee, eds., National Academy Press 2001) (hereinafter "Lord & McGee").

"The main characteristics that differentiate autism from other developmental disorders include 'behavioral deficits in eye contact, orienting to one's name, joint attention behaviors (*e.g.,* pointing, showing), pretend play, imitation, nonverbal communication, and language development.'" *Id.* (quoting Lord & McGee at 20). Many autistic children appear to have tuned the world out and are in their own worlds, not paying attention to others or engaging in normal social interactions. Nat'l. Insts. of Mental Health, *Autism* 3 (hereinafter "*Autism*" (SB–1)). While some autistic people function at average or high intelligence levels, the National Institute of Mental Health reports that 75–80% of people with autism are mentally retarded to some extent. *Autism* 27 (SB–1).

Testimony by several experts during the administrative hearing explained that autistic children like RT lack two skills that are essential to learning. First, such children lack so-called "imitation" skills, which are the ability to watch another do an action and imitate that action. Much of what a young child learns to do, especially a child who lacks expressive or receptive language skills, is through imitation.

Second, many autistic children lack so-called "joint attention" skills, which are the ability to focus attention on something that is pointed out to the child by another. For example, if a teacher directs students to look at a story book, non-autistic students' gaze will move to the book and then back to the teacher when the teacher resumes talking. In contrast, many autistic students, especially those who lack receptive communication skills, will stare off into space rather than looking at the book and will not adjust their gaze even if verbally prompted. More profoundly, autistic students with significant deficiencies in basic attention skills, known as "attending skills," can not maintain focus on a task for even a few seconds. Their attention will switch to other stimuli in their environment; for example, a light, a fan, or a spot on the wall. As both Dr. Carlson and Ms. St. Amand testified, without attending skills, a child can not maintain attention long enough to learn.

Related to the fact that autistic people are often in their own worlds and do not pay attention to normal stimuli, autistic people will frequently engage in self-stimulating behaviors called "stimming" in the jargon of the study of autism. Among autistic children, stimming may be displayed, for example, in the form of rocking back and forth, flapping one's hands repetitively, groaning or murmuring, or, in the case of young children, mouthing objects such as toys as a means of stimulus rather than engaging in normal play activities. When an autistic child is engaged in stimming behaviors, it is not able to focus on other stimuli such as educational instruction.

While there is, at this time, no cure for autism, the symptoms of autism can be mitigated. Autistic children can learn skills that enable them to integrate into the natural learning environment. However, the three components of autism just described—stimming, the lack of imitation and joint attention skills—present a challenge to educating an autistic child. "For this reason, early diagnosis is crucial because education (of children as well as of parents and teachers) is the primary form of treatment, and the earlier it starts, the better. Education covers a wide range 'of skills or knowledge—including not only academic learning, but also socialization, adaptive skills, language and communication, and reduction of behavior problems—to assist a child to develop, independence and personal responsibility.'" *Amanda J.*, 267 F.3d at 883 (quoting Lord and McGee at 9.).

Testimony at the due process hearing established that early intervention through specialized education is particularly important for the development of language skills among autistic children. Dr. Carlson and Dr. Oswald both testified that there is a window of opportunity during which an autistic child's mind is open to learning language. This window generally closes sometime between age six and eight. If autistic children do not develop language capabilities by that time, they are likely to remain without those skills for the rest of their lives. Half of all autistic children remain mute throughout their lives. *Autism* 9 (SB–1).

## B. TEACCH

First developed at the University of North Carolina in the 1970's, the Treatment and Education of Autistic and related Communication-handicapped Children or "TEACCH" method "is best described," states one scholar, "as a way of educating children with autistic learning styles by taking advantage of the relative strengths that a child with autism may exhibit through structured teaching that leverages a preference for routine and predictability, and relative ability to succeed in a visually-based rather than auditory-based environment." Siegel, *supra*, 23 (SB–3). According to Siegel, the goals of TEACCH are to provide strategies that support autistic persons throughout their lives and that facilitate autonomy at all levels of functioning. *Id.* at 26. Ms. Butler, who taught the autistic program at Twin Hickory in 2002, testified that she used TEACCH when RT was in her class.

Under the September and November 2002 IEPs, RT attended the TEACCH program at Twin Hickory for three hours per day. The classroom at Twin Hickory, consistent with TEACCH methodology, was divided into discrete learning areas for individual and group work. The different areas were separated by physical dividers to combat against the autistic students' lack of attention and so that students would consistently associate each learning space with a particular task. For example, in one area a student would work alone on a computer while in a different area all the students would circle up with the teacher to work on calendar skills or do so-called "finger songs" (*e.g.* the "Itsy–Bitsy Spider").

In accord with TEACCH methodology, Ms. Butler's classroom used the Picture Exchange Communication System ("PECS"), whereby pictures representing activities are set in sequences to represent each student's schedule. Because many autistic children lack language skills, PECS is an alternative communication system used to transition students from one activity to the next and also to teach receptive language skills and task management.

Testimony revealed, and the exhibits submitted by the parties support, that TEACCH predominantly uses group-based instruction rather than one-on-one instruction. There were six or seven students in RT's class at Twin Hickory and one teacher and one teacher's aide. Although students worked on their own for ten to fifteen minute intervals at a time at individual work stations, each student received only fifteen minutes of constant instruction one-on-one with the teacher during the three hour school day. However, Ms. Butler testified that she and the teacher's aide circulated in the classroom to make sure that students were attending to task, not self-stimulating, and were making progress with their particular goals. Given the divided layout of the room, the three-to-one student-teacher ratio, and Ms. Butler's description of moving from student to student every two to three minutes to keep them on task, Ms. Butler's job would seem to entail constant movement from child to child rather than a focused time-intensive method of teaching children who lack the most basic skills needed to learn.

Nevertheless, Dr. Driver and Ms. Butler testified, and publications submitted as exhibits by the School Board support, that TEACCH has been successful at teaching some autistic children and allowing them to transition into the natural environment. It is currently the method universally employed by the North Carolina public school system. Indeed, Dr. Oswald, one of the parent's witnesses, testified that "the TEACCH program is first of all a system of services. And it's a very good one." (Tr.3:26:5–7.) [4]

However, Dr. Oswald also explained that the problem with TEACCH is that "folks have talked about it as though it were a technology of teaching. That it really isn't." (Tr.3:26:5–7.) Dr. Carlson and Ms. Hendricks stated that TEACCH was designed in the 1970's before most the recent and significant developments occurred in understanding autism and autistic education.

The record demonstrates that TEACCH seeks to and can be successful at teaching some autistic people greater independence, social interaction skills, and basic self-care skills, but, in Ms. Hendricks words, "doesn't get into the components of direct instruction, how to teach social skills, how to teach language, how to teach writing" (Tr.3:146:15–19.) and, as Dr. Oswald testified, "is less effective and sometimes completely ineffective for young children with significant deficits in basic social language communication skills." (Tr.3:27:4–7.)

Likewise, Dr. Carlson testified that, when TEACCH was created in the 1970's, it was believed that autistic childrens'

symptoms would remain fairly consistent over time. There wouldn't be a whole lot of cognitive development. And most kids with autism at that time ended up in some sort of sheltered employment situation.

The elements you see in TEACCH are very reflective of that expectation. There is a lot of focus on kids being able to complete tasks independently, to independently follow visual schedules, things like that. And those are certainly essential life skills for a child with autism to learn. However, what is absent from TEACCH methodology is the number of direct instruction hours that we now know are critical to producing

---

4. Because the due process hearing took place over three days—August 15, 18, and 19, 2003—there are three volumes of transcripts: Tr.1, Tr.2, and Tr.3, respectively. Citations to the transcript are stated herein as (Tr. # :page# :line# -# .).

good skill gain in young children with autism.

Q: Skill gains like the cognitive skills?

A: Uh-huh. Language, developing functional language, developing cognitive skills, developing critical skills like imitation, joint attention, those kinds of things.

(Tr.1:182:3–4.) Siegel writes that a significant concern with TEACCH is the "belief that TEACCH 'gives in' to autism rather than fighting it." Siegel, *supra*, 26 (SB–3). During the hearing, Dr. Carlson was asked if TEACCH was essentially the same program that was used in the 1970's to enable developmentally delayed students to cope and function more independently in normal society. Dr. Carlson responded that it was. (Tr.1:pp. 235–240.) Carrie Anne St. Amand, the speech therapist who worked for the Faison School and who has researched the TEACCH method extensively, stated that "[t]he TEACCH methodology does not have any scientifically validated evidence to support itself," (Tr.2:41:2–3.) whereas ABA therapy was one, among several, scientifically validated methods of teaching autistic children. (Tr.2:40:21–23.) The record presents a convincing demonstration that the TEACCH method was not appropriate for instructing RT, considering the level of RT's basic learning skills (imitation and joint attention skills), and his degree of stimming. Likewise, the record makes a convincing case that the methodology was not appropriate to teach RT the more complex language, pre-writing, and academic skills needed to transition towards education in the natural environment.

Notwithstanding the rather convincing record criticisms of the TEACCH method in general, the Court does not make any findings of fact as to the appropriateness *in general* of the TEACCH method because, to the extent that the TEACCH method is at issue here, the issue is whether that method, as used at Twin Hickory pursuant to the November 2002 IEP, was appropriate to educate RT.

## C. ABA

As "the most widely researched treatment approach," Siegel, *supra*, 23 (SB–3), Lovaas therapy, named after its pioneer O. Ivar Lovaas, has spawned several methods, including Applied Behavioral Analysis, Discrete Trial Training, and Intensive Behavior Intervention, of teaching autistic children the basic building blocks that are required for learning in the natural environment. *Id.*[5] Siegel lists the goal of Lovaas-based methods as "teach[ing][the] child *how to learn* focusing on developing skills in attending, imitation, receptive/expressive language, pre-academics, and self-help." *Id.* (emphasis in original).

Testimony by the experts at the administrative hearing, as well as the publications submitted as evidence, demonstrates that ABA therapy entails lengthy and intensive one-on-one instruction by a trained teacher with the autistic student. Goals are highly defined and broken down into small discrete components. The teacher gives an instruction to the student, who responds either compliantly, non-compliantly, or with delay, and the teacher either responds immediately to correct the non-compliant response, praises and rewards an immediate compliant response, or delays the response in the case of the student's delay. Repetitive practice aims to teach the student the skill. Instructors maintain detailed data, recording each re-

**5.** Because RT was tutored at home based on the ABA program and the Faison School predominantly uses ABA therapy, it is the only Lovaas-based therapy that this opinion will review.

sponse by the student as it is made. Once several discrete skills are mastered separately, the tasks are intermingled to develop so-called "discrimination" skills. ABA is time intensive. All the witnesses' knowledgable in ABA therapy testified that, at least, six hours of ABA therapy year round would be required for a student like RT to reach normal grade level.

Several of the School Board's witnesses testified, and the literature submitted as exhibits supports, that, because ABA is one-on-one all day, it does not teach social interaction skills very well. For that reason, the School Board's witnesses concluded that it is not the least restrictive environment.[6] Another significant problem with ABA is that, because it is one-on-one, it is more expensive than other methods, such as TEACCH. Siegel, *supra,* 25.

Dr. Carlson testified that the departments of public health of the states of Maine, California, New York, Connecticut, and the Province of Ontario, Canada each had conducted reviews of the scholarly literature and separately had concluded that ABA therapy presents the best evidence to support its effectiveness. That is due to the detailed data recording ABA utilizes.

With this background and these factual findings in mind, it now is appropriate to consider the decision of the Hearing Officer.

## IV. The Hearing Officer's Decision

### A. The Decisional Process

The Hearing Officer noted in his decision that then-recent Fourth Circuit and

governing district court decisions had emphasized the need to "give enough weight to the professional judgment of witnesses for the school board [and] pay appropriate attention to experts." (Hearing Officer's Opinion at 26.) (hereinafter "H.O.'s Op. at # .") He stated that those cases "virtually eliminate[ ] any ability to decide the issues at the conclusion of the case," and required him to apply "more careful scrutiny" of the transcript and record. *Id.* The Court notes these comments to highlight the deliberative and detailed process that the Hearing Officer used to prepare a very thorough opinion.

### B. The Hearing Officer's Decision

The Hearing Officer found, *inter alia,* that:

(1) This STUDENT made little, if any, measurable progress and received little, if any, educational benefit in the special education programs that he attended in Henrico County.

(2) The IEP of November 2002 was not designed so as to implement educational benefit.

(3) The primary skill that this STUDENT lacked was that of attention labeled herein as attending skill.

(4) The County's methodology involving basically group instruction does not address the attending skill problem and, therefore, does not deliver to the STUDENT educational benefit as measured by progress.

(H.O. Op. at 26–27.) These findings of fact essentially summarize the hearing officer's decision.

---

6. The IDEA envisions that, "[t]o the maximum extent appropriate, children with disabilities ... are educated with children who are not disabled...." § 1412(a)(5)(A). Unfortunately, the School Board relies on this provision as the principal basis for arguing that one-on-one education is not appropriate, except for disabled children who have discipline problems. In this case, that approach has converted a statutory benefit for a disabled child into a bar to an otherwise appropriate education.

The Hearing Officer then analyzed the testimony of the School Board's witnesses. He wrote, "[c]onsistent with the requirement of law, the County's evidence was given the most significant of consideration. Careful consideration and great weight was given to each of the County's witnesses.... That evidence was simply not persuasive. [sic]" (*Id.* at 28.)

The Hearing Officer then analyzed the evidence presented by the parent's witnesses and stated that he gave "the most credibility to the Parents' witnesses in reaching [his] decision." (*Id.* at 31.) The Hearing Officer credited the testimony of Mrs. T. and Dr. Oswald about RT's skill level in November 2002, finding that, when considered with the other evidence, it showed that RT lacked sufficient attending and imitation skills to learn in the program outlined in the November 2002 IEP. The Hearing Officer also found that the November 2002 IEP did not list the attaining of attending skills as a goal; that the majority of the goals listed were the same as those in prior IEPs; and that the TEACCH methodology, as employed in the Twin Hickory program, was not likely to be an effective method for providing an appropriate education to RT at the time in issue. (*Id.* at 33.) The Hearing Officer credited testimony offered by Dr. Carlson that RT lacked joint attention and imitation skills and that, without those skills, and a program designed to provide RT with those skills, RT would make little or no educational progress. (*Id.* at 32.)

In summary, the Hearing Officer stated, "what the evidence showed as a whole was that [RT] throughout his Henrico educational experience lacked and never attained attending skills. He could not pay attention. Until he was able to pay attention [sic] he did not while in the Henrico Public School System and could not re-ceive the appropriate educational benefit contemplated under IDEA." (*Id.* at 30.)

The Hearing Officer's factual conclusions are supported by the preponderance of the record evidence. As explained below, the Court, after giving them "due weight," finds the Hearing Officer's finding to be persuasive.

## V. The Legal Standards Applicable To Resolution Of This Case

Civil actions brought under 20 U.S.C. § 1415(i)(2) of the IDEA "are procedurally unique in that they are independent civil actions in which the district court considers the record of the state administrative hearing, as well as any new evidence offered by a party, and makes its own findings based on the preponderance of the evidence." *County Schl. Bd. of Henrico County v. Z.P.*, 399 F.3d 298, 304 (4th Cir.2005). "Although the federal action is an independent civil action and not an appeal of the state administrative proceeding, the Supreme Court has made it clear that the district court must give "due weight" to the state administrative proceeding." *Id.* (citing *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034; *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 103 (4th Cir.1991) (other citations omitted)). The Fourth Circuit has explained that the "due weight" to be given to the state administrative decisions requires that:

findings of fact by the hearing officers in [IDEA] cases ... be considered *prima facie* correct, akin to the traditional sense of permitting a result to be based on such fact-finding, but not requiring it.

We are further of the opinion that when fact-findings are regularly made and entitled to *prima facie* correctness, the district court, if it is not going to follow them, is required to explain why it does not.... After giving the administrative fact-findings such due weight, if

any, the district court then is free to decide the case on the preponderance of the evidence, as required by the statute. *Doyle*, 953 F.2d at 105 (citations omitted). Whether an IEP is appropriate is a question of fact, and a district court is to independently make factual findings as to an IEP's appropriateness. *Z.P.*, 399 F.3d at 298.

## VI. Threshold Legal Issues And Conclusions

Before the Hearing Officer and here, the School Board makes essentially two substantive arguments on the merits and a set of legal arguments on the validity of the Hearing Officer's decision. As to whether the November IEP was appropriate, the School Board first argues that the November IEP was reasonably calculated to provide RT with educational benefit because the IEP was designed based on the School Board's reasonable belief at the time that RT was so significantly cognitively impaired (even mentally retarded) that he could not learn at a faster rate than he had in the PEDD program or more than he was targeted to learn in the TEACCH program. Second, the School Board argues that RT would have obtained legally sufficient educational benefit from the November IEP based on how RT had done in the PEDD program, his several weeks at Twin Hickory, and how other autistic students had progressed in the Twin Hickory program.

As to the validity of the Hearing Officer's decision, the School Board argues that the Hearing Officer erred as a matter of law by: (1) assigning the burden of proof improperly; (2) admitting and considering evidence generated after November 4, 2002, which was not available to the November IEP team; and (3) not determining whether RT's progress was commensurate with the understanding in the Fall of 2002 of his cognitive capacity. The School Board argues that, because of these alleged errors of law, the Hearing Officer's decision is entitled to less weight, and that application of the proper legal standards would result in different factual findings and a ruling in the School Board's favor. Because of the nature of these legal arguments, it is appropriate to address them before assessing the Hearing Officer's findings of fact and making additional independent findings.

### A. Burden Of Proof

■ In *Schaffer v. Weast*, —— U.S. ——, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005), the Supreme Court held that the burden of proof[7] in an administrative due process hearing under the IDEA is on the party seeking relief. *Id.* at 531. The School Board argues that the Hearing Officer incorrectly assigned to the School Board the burden of proving that the November 2002 IEP was inappropriate. The School Board argues that, as a result of the mis-allocation of the burden of proof, the Hearing Officer's decision is entitled to less weight. The parents argue that the Hearing Officer did not assign the burden of proof to the School Board. The parents also argue that, because the standard of proof before the Hearing Officer is preponderance of the evidence, the burden only really matters when the evidence is in equipoise, which was not the case here because the Hearing Officer found that the parents had met their burden decisively. Finally, the parents argue that the School Board has waived its right to raise the burden of proof argument because, to the extent that the burden was improperly assigned during the hearing, the School Board did not

---

7. The Supreme Court in *Schaffer* used the terms "burden of persuasion" and "burden of proof" interchangeably and to mean the same thing. *Schaffer*, 126 S.Ct. at 534.

object at the time or in its Complaint in this action.

■ To support its argument, the School Board contends that, in a pre-hearing conference, the Hearing Officer held that the School Board had the burden of proof. To prove that contention, the School Board cites to a part of the transcript in which the Hearing Officer agrees with certain statements made by the School Board's counsel after counsel had referred to the School Board meeting its burden. (Tr.2: pp. 13–15) The cited transcript is ambiguous. It could be construed to mean that the Hearing Officer had placed the burden of proof on the School Board. However, it could be construed to mean that the parties had agreed to that construct for the hearing. There is nothing in the record to show that the School Board objected to such a procedure and the School Board did not raise the issue in its Complaint. Thus, the School Board has not shown that the Hearing Officer improperly assigned to it the burden of proof.[8]

More importantly, the Hearing Officer's decision does not support the School Board's argument because the decision does not mention that the School Board had not met its burden. Nor does the decision base its findings on any such view of the record. Instead, the Hearing Officer heard all the evidence, weighed it thoroughly, found that the parents' evidence was more credible and persuasive than that offered by the School Board, and then rested his decision on that evidence. The

Hearing Officer held that "the November, 2002 IEP does not provide this student a free and appropriate education as it was not reasonably calculated to provide him educational benefit." (H.O.'s Op. at 32.) This holding shows that, without regard to the order of presentation,[9] the evidence established that the IEP was inappropriate. The Hearing Officer also found that the parents won decisively. (See H.O.'s Op. at 30–32.) Because a ruling on the inappropriateness of an IEP is based on a preponderance of evidence,[10] and because the hearing officer found that the November IEP was decisively inappropriate, the parents met their burden of proof. Having so ruled, it is unnecessary to address the parents' waiver argument.

At the hearing before this Court, the School Board acknowledged, and the parents agreed, that, as the party that filed this independent action seeking relief from the Hearing Officer's decision, the School Board has the burden of proof at this stage in the proceedings.

## B. Consideration Of Post–IEP Evidence

■ Next, the School Board argues that the Hearing Officer erred in admitting and considering evidence that only came to light after November 4, 2002 because that evidence was not available to the November IEP team. Specifically, several of the parent's witnesses testified that at the Faison School, which RT did not begin until December 2, 2002, RT made rapid and significant progress using the ABA method. The School Board also seeks to bar

---

8. Nor does the fact that the School Board went first in presenting evidence establish how the burden of proof was allocated. The record does not show why that happened.

9. Actually, while the School Board presented several witnesses first, the parties intermixed the order of the witnesses to accommodate

witnesses' schedules and the hearing officer's time.

10. See 8 VAC 20–80–76(J)(15) ("Hearing officer shall make no presumptions in the case and base the findings of fact and decisions solely upon the preponderance of the evidence presented...")

consideration of the parents' experts' opinions that were formulated after the rejection of the November IEP but based on information available both before and after the November IEP. The School Board argues that only evidence that was available to the IEP team can be considered in deciding whether the IEP was appropriate.

The Hearing Officer stated in his opinion that he considered the evidence from the Faison School only for the limited purpose of assessing the School Board's arguments that: (a) RT was so cognitively impaired that he could not have made any greater progress than he had made in the PEDD and Twin Hickory programs; and (b) therefore, the IEP was reasonably calculated to provide RT with an education that was appropriate for him, considering the asserted cognitive impairment. The Hearing Officer wrote:

> I have carefully considered the evidence of [RT's] progress at the Faison School *only in terms* of the determination of his expected receipt of educational benefit from the November 02 IEP as measured by the STUDENT's progress. This consideration is directly relevant to the County's attempt to explain this STUDENT's lack of progress by reference to his cognitive impairment in addition to his autism as being an explanation of a very limited ability to progress. This attempt fails being completely refuted by the evidence ... showing significant progress [at] ... the Faison School [sic].

(H.O.'s Op. at 30–31.) (emphasis added). The Faison School evidence showed that RT had the cognitive capacity not only to gain imitation and attending skills, but also to learn to understand language and to speak.

Although the IDEA does not state what type of evidence is admissible in a due process hearing, it does provide that the hearings are to be conducted under state law. § 1415(f)(1). Virginia regulations on this topic do not clearly establish what evidentiary rules apply either. However, under Virginia regulations, a hearing officer may "require an independent educational evaluation of the child" conducted at public expense. 8 VAC 20–80–76(K)(7). Additionally, the parties are required to disclose to each other at least five days prior to the hearing "all evaluations completed by that date and recommendations based on the offering party's evaluations that the party intends to use at the hearing." 8 VAC 20–80–76(F)(2)(a).

These regulations clearly contemplate that evidence not available to the IEP team will be admissible at the due process hearing. If the hearing officer orders an educational evaluation, that evaluation will *per force* not be completed before an IEP is rejected. Also, unless the evaluation only looks at records dating from before the IEP date (that is, the evaluator does not actually evaluate the actual child), it will *per force* be based on information that was not available to the IEP team. Likewise, the rule on disclosure of evaluations and recommendations contemplates that those documents may be completed at any time prior to five days before the hearing.

Furthermore, wholly apart from those regulations, at argument before this Court, the parties agreed that due process hearings are governed by loose and amorphous discretionary evidentiary rules, presumably based on the common law of evidence as interpreted by the courts of Virginia. Given that construct, and the regulations discussed above, it is clear that the Hearing Officer acted well within his discretion in considering, for the limited purpose to which they were confined, the reports and opinions of the parents' witnesses and the information that came to light after November 4, 2002.

The School Board argues that, even if the hearing officer acted within his discretion, the Court should not consider the post-IEP evidence in conducting its independent review of the facts. To support this argument, the School Board cites *County Schl. Bd. of Henrico County v. Z.P.*, 3:03cv396 (E.D.Va. Oct. 28, 2003), for the proposition that, "[w]hen the IEP has not been implemented because of a different placement by the parents, the determination of the IEP's reasonableness at the time of its creation is limited to the information known to the IEP team when it wrote the IEP." *Id.* at Concl. of Law 56. The School Board also quotes another district court opinion for the proposition that "[c]ourts should not judge the IEP in hindsight; instead courts should look to the IEP's goals and methodology at the time of its creation and ask whether it is reasonably calculated to provide educational benefit." *Bd. of Educ. of the County of Kanawha v. Michael M.*, 95 F.Supp.2d 600, 609 (S.D.W.Va.2000). Both *Z.P.* and *Michael M.* based these conclusions on *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir.1999) ("We do not judge [a plan] in hindsight; rather, we look to the [plan's] goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer [the child] with a meaningful benefit.") That, of course, is precisely what the Hearing Officer did and what this Court will do. And, in so doing, it is entirely appropriate to consider the post-November 2002 evidence here at issue for the limited purpose for which it was offered and admitted into the record. Nothing in *Adams, Michael M.*, or *Z.P.* suggest a different result.

Moreover, the Fourth Circuit has held that "courts should endeavor to rely upon objective factors, such as actual educational progress, in order to avoid "substitut[ing][our] own notions of sound educational policy for those of the school authorities which [we] review." " *MM*, 303 F.3d at 532 (quoting *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 1000 (4th Cir.1997)). In *MM*, the district "court failed to consider the actual progress made by MM during the [challenged year], even though an important measure of an IEP's success is whether the disabled child has made progress on the basis of objective criteria." *Id.* (citing *Rowley*, 458 U.S. at 207, n. 28, 102 S.Ct. 3034.) *MM* seems to require this Court to consider the objective evidence of RT's educational progress at the Faison School.

The School Board argues that *MM*'s rule does not apply where the IEP has never been implemented because, in *MM*, the IEP had been implemented, and RT's November IEP was never really implemented. However, that distinction is without merit. If, as required by *MM*, evidence obtained after the IEP is written is to be used to assess the adequacy of that IEP, evidence obtained after the IEP is written also can be used to assess the inadequacy of the IEP. And, it makes no difference whether that objective evidence comes from a child's tenure at a public school under a IEP or a private school without an IEP. In any event, the evidence here at issue is only considered for the previously described limited purpose.

At the due process hearing, the parents introduced the post-IEP evidence only to show that the School Board had grossly miscalculated both RT's ability to learn and the mode of learning that RT needed to make progress. After just several months of intense ABA therapy at the Faison School, RT had made substantial progress.

The evidence conclusively shows that the School Board greatly misunderstood RT's

cognitive capacity and educational needs and thereby designed an IEP that both underestimated and inappropriately served him. This conclusion is supported by how proximate in time RT's success at the Faison School was to the writing of the November 2002 IEP. The School Board can not escape its responsibilities under the IDEA simply by stating that, before November 2002, it reasonably believed that RT was too cognitively impaired to learn where, as here, objective evidence obtained only several months thereafter demonstrated that the School Board's assessment was greatly in error. Just as the district court was obliged to consider post-IEP evidence of MM's actual progress in assessing whether MM's IEP was appropriate, this Court can likewise consider post-IEP evidence of RT's actual progress in assessing whether RT's IEP was appropriate.

### C. Progress Commensurate With Cognitive Capacity

The School Board next argues that the Hearing Officer erred as a matter of law by failing to assess RT's cognitive capacity and by failing to base the determination of whether the IEP was reasonably calculated to provide RT with educational benefit upon that assessment. To support this contention, the School Board cites several cases that stand for the settled proposition that educational benefit "must be gauged in relation to the child's potential." *E.g. Polk v. Central Susquehanna Intermediate Unit 16,* 853 F.2d 171, 185 (3d Cir. 1988); *see Rowley,* 458 U.S. at 202, 102 S.Ct. 3034. The Fourth Circuit has echoed this principle in stating that a "FAPE must be tailored to the individual child's capabilities and that while one might demand only minimal results in the case of the most severely handicapped children, such results would be insufficient in the case of other children." *Hall v. Vance County Bd. of Educ.,* 774 F.2d 629, 636 (4th Cir.1985).

 It is true that the Hearing Officer did not make a specific finding of fact on RT's exact cognitive capacity. However, the Hearing Officer clearly held that, whatever RT's cognitive capacity was in November 2002, it far exceeded what the School Board believed it to be. Assessing the School Board's argument that RT lacked the cognitive capacity to progress more than he had, the Hearing Officer stated that "this attempt fails being completely refuted by the evidence on the whole and by the . . . evidence . . . showing significant progress . . . at the Faison School." (H.O.'s Op. at 31.) The Hearing Officer continued that the evidence from the Faison School "confirm[s] that [RT] has the ability to receive educational benefit not recognized or planned by the November, 2002 IEP and not provided for by the very well intended but failed classroom programs of the County." (H.O.'s Op. at 33.) Accordingly, consistent with *Rowley* and *Hall,* the Hearing Officer clearly assessed the IEP in relation to RT's cognitive capacity and then found the IEP was entirely deficient.

The School Board attempts to rebut this conclusion by arguing that the School Board's assessment of RT in November 2002 is supported by evidence in the record that, in November 2002, the School Board reasonably could have concluded that RT was at least moderately retarded. While there was testimony that RT was significantly cognitively impaired, no witness testified that by November 2002, RT was mentally retarded. Dr. Oswald, the parents expert psychiatrist, replied "I guess" when asked whether it was possible for the IEP team to have reasonably concluded that RT was at least moderately retarded in addition to autistic. (Tr.3:44–

45:22–25,1–6.) However, Dr. Oswald's response seems to be more a reluctant assessment of the outer bounds of possibility than the absolute conclusion that the School Board asserts it to be. The Hearing Officer, who heard the testimony in person, certainly did not interpret Dr. Oswald's statement to mean that RT was, in fact, known to be moderately mentally retarded in November 2002.

The School Board also points to the testimony of Karen Swink, the School Board's speech pathologist, in support of it cognitive impairment argument. However, Dr. Swink testified only that, based on her examination of RT in September of 2002, RT's primary disability "was a significant impairment of his cognitive ability" as opposed to autism. The School Board did not prove that "impairment of cognitive ability" means moderately mentally retarded.[11] Nor does the record otherwise permit such a finding. Moreover, the parents conceded that RT was cognitively impaired, but stated that his primary disability was autism. That conclusion is confirmed, and the School Board's argument refuted, by the fact that at the October 30, 2002 IEP meeting, after Dr. Swink conducted her study, the School Board apparently changed RT's disability category from "Developmentally Delayed" to "Autism." (See SB–58 at 1, SB–70 at 1.)[12] This fact lays bare the School Board's assertion that it believed that RT's primary disability was moderate mental retardation.

## D. Deference To Educators And Credibility Determinations

The School Board also argues that the Hearing Officer erred as a matter of law in not according the opinions of the School Board's educators the deference to which they are entitled. More specifically, the School Board argues that the Hearing Officer substituted his preferences in educational policy for the opinions of the School Board's educators and did not address many important conflicts in the testimony of the witnesses or note that many of the parents' witnesses did not see RT at Twin Hickory or observe Twin Hickory's autism program at all. Consequently, says the School Board, the Hearing Officer's decision is entitled to less weight. The School Board's argument on the deference issue is largely based on the fact that the

11. Both parties and the witnesses in this matter use the term "cognitive impairment" or "cognitively impaired." Yet, the record does not contain a clear definition of the meaning of this term. At argument before this Court, the School Board argued that cognitively impaired is equivalent to "mentally retarded" for the purposes of this case because RT displayed all the characteristics of a mentally retarded child.

The Code of Federal Regulations defines mental retardation as "significantly subaverage general intellectual functioning, existing concurrently with deficits in adaptive behavior and manifested during the developmental period, that adversely affects a child's educational performance." 34 C.F.R. § 300.7(c)(6).

The parents argue that the term cognitively impaired refers to a spectrum of mental disability that includes autism and on which mental retardation is an extreme. On this record, the Court has no basis to conclude that "significantly cognitively impaired" or "significant cognitive impairment" is the same as mentally retarded.

12. RT's disability was identified in the April 26, 2002 and September 4, 2002 IEP as "Developmentally Delayed." (SB–48 at 1, 58 at 1.) Apparently, the October 30, 2002 Draft IEP had RT's disability typed in as "Developmentally Delayed." (SB–70 at 1.) Subsequently, those typed words were crossed out by hand and the word "Autism" was written in above. This interlineated version of the IEP is the version submitted as evidence by the School Board as the challenged November 4, 2002 IEP. Accordingly, the Court interprets this version to represent what the School Board deemed to be the complete IEP.

Hearing Officer found several of the School Board's witnesses to be lacking in credibility.

Because, in this case, the arguments related to deference owed to educators and the credibility of witnesses are closely related, these two issues will be addressed in concert. In the School Board's argument, the credibility issue is cast as one of law, but, in reality, it is also an issue of fact.

■ A hearing officer and a district court must "give appropriate deference to the decisions of professional educators" because the " 'the task of education belongs to the educators' " *M.M.*, 303 F.3d at 533 (quoting *Springer v. Fairfax County Schl. Bd.*, 134 F.3d 659, 663 (4th Cir.1998)). The Fourth Circuit has stated that:

> As the Court made clear in *Rowley*, once a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second-guess the judgment of education professionals. 458 U.S. at 207–08, 102 S.Ct. 3034. Neither the district court nor this court should disturb an IEP simply because we disagree with its content. Rather, we must defer to educators' decisions as long as an IEP provided the child "the basic floor of opportunity that access to special education and related services provides." *Id.* at 201, 102 S.Ct. 3034.

*Tice v. Botetourt County Schl. Bd.*, 908 F.2d 1200, 1207 (4th Cir.1990). *See Z.P.*, 399 F.3d at 307 (emphasizing "as long as").

More recently, in *Z.P.*, the Fourth Circuit applied the quoted language from *Tice* when it held that "to give deference only to the decision of the School Board would render meaningless the entire process of administrative review." *Id.* (quoting *Schl. Bd. v. Malone*, 762 F.2d 1210, 1217 (4th Cir.1985)). Thus, the *Z.P.* Court explained that:

> The fact finder is not required to conclude that an IEP is appropriate simply because a teacher or other professional testifies that the IEP is appropriate... The IDEA gives parents the right to challenge the appropriateness of a proposed IEP, and courts hearing IDEA challenges are required to determine independently whether a proposed IEP is "reasonably calculated to enable the child to receive educational benefits." *To conclude that the hearing officer erred simply because he did not accept the testimony of the School Board's witnesses ... would render meaningless the due process rights* guaranteed to the parents by the IDEA.

*Id.* (quoting *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034). In addition, the deference due to a school district's educators "does not give a district court license to ignore the requirement of *Rowley* and *Doyle* that the findings of the *administrative proceeding* must be given due weight." *Id.* (emphasis in original) (referring to *Doyle v. Arlington County Schl. Bd.*, 953 F.2d 100 (4th Cir.1992)).

■ As to credibility determinations, the Fourth Circuit has consistently held that reviewing courts should defer to the hearing officer's determinations. *See, e.g., Z.P.*, 399 F.3d at 307 (stating that credibility determinations implicit in a hearing officer's decision are as entitled to deference under *Doyle* as explicit findings). In *Doyle*, the Fourth Circuit stated "[w]e may not reverse a trier of fact, who had the advantage of hearing the testimony, on the question of credibility" so long as the trier of fact did not stray from the norm of the fact finding process. *Doyle*, 953 F.2d at 104.

In *JH ex rel. JD v. Henrico County School Board*, 395 F.3d 185 (4th Cir.2005), the Fourth Circuit remanded the matter to the hearing officer and directed him to

explain why he chose to credit the testimony of the parents' expert witnesses over the conflicting testimony of the School Board's witnesses. *Id.* at 197. The hearing officer also was directed to expressly acknowledge if an expert had not observed the child first hand. However, in *Z.P.*, a later opinion, the Fourth Circuit wrote that *Doyle* "does not require the Hearing Officer to explain in detail its reasons for accepting the testimony of one witness over that of another." *Z.P.*, 399 F.3d at 307. It was sufficient that the hearing officer in *Z.P.* had explained the basis for his ruling and made it clear why he was not persuaded by the School Board's evidence. *Id.*

■ Applying the principles of deference and credibility to the decision in this matter, the Hearing Officer's decision makes clear that he properly accorded the School Board's witnesses appropriate deference. He wrote, "[c]onsistent with the requirement of law the County's evidence was given the most significant of consideration. Careful consideration and great weight was given to each of the County's witnesses.... That evidence was simply not persuasive." (H.O.'s Op. at 28.) Where the Hearing Officer gives a school district's witnesses the kind of consideration reflected here, the Hearing Officer has granted the School Board's witnesses due deference and, therefore, has not erred as a matter of law simply because the Hearing Officer did not accept the views offered by the School Board's witness. *Z.P.*, 399 F.3d at 307.

The Hearing Officer also explained in sufficient and specific detail why he chose not to credit the testimony of the School Board's witnesses. *See Id.* For example, the hearing officer did not credit Dr. Driver because she spent only 40 minutes observing RT, did not credit Dara Butler because she could not remember certain

key facts or could not answer certain questions on the stand, and did not credit Patricia Nelson because her testimony contradicted her own prior reports about RT. The Hearing Officer also said of Dara Butler, Patricia Nelson, and Julie Szarko that their "appearance and manner on the witness stand appeared to be without credibility." (H.O. Op. at 28,29.) Having heard and seen the live testimony, the Hearing Officer acted within the norm of the fact finding process in making these credibility determinations, and this Court finds no grounds to reverse those determinations. *See Doyle,* 953 F.2d at 104. To the contrary, the record fully supports the Hearing Officer's conclusions.

In contrast, the Hearing Officer found Dr. Carlson and Mrs. T. to be the most credible witnesses "based on their intelligence, their opportunity to know the things about which they testified and their background and experience in dealing with the unique individual requirements of RT." (H.O.'s Op. at 31.) While it is true that other witnesses such as Ms. Butler and Dr. Nelson had greater opportunity to come to know RT than did Dr. Carlson, that certainly does not warrant rejection of the Hearing Officer's credibility determination with regard to those teachers.

■ The hearing officer did not specifically discuss or balance the fact that several of the parents' witnesses—Dr. Oswald, Ms. Rusyniak, Ms. St. Amand, and Ms. Adkins—had not observed RT in the Twin Hickory autism class. However, this failure was not material. The parents presented neither Ms. St. Amand nor Ms. Adkin's testimony to address RT's performance at Twin Hickory. Their testimony related to RT's behavioral characteristics and education level in the Fall of 2002. Dr. Oswald and Ms. Rusyniak testified that RT lacked the basic skills necessary for academic learning and that the

goals set forth in the November 2002 IEP were constructed on the assumption that RT sufficiently possessed, or could obtain during his three hour program at Twin Hickory, those basic skills. Ms. Rusyniak concluded that RT would not have made appropriate progress even with three hours of ABA therapy. Thus, the fact that those two witnesses had not observed RT at Twin Hickory was inconsequential because their testimony showed that, even if the Twin Hickory TEACCH program had run exactly as it was designed to, RT would not have made progress there. The record, considered as a whole, leads to the firm conclusion that the Hearing Officer did not err in crediting the testimony of those witnesses who had not observed RT at Twin Hickory. See Doyle, 953 F.2d at 104.

Instead, consistent with Doyle and Z.P., and based on an assessment of the record as a whole, the Court reaffirms the Hearing Officer's decision to credit the parents' witnesses. Mrs. T.'s testimony is a specific and careful account of her discovery of her son's disabilities, the hard work she put into understanding autism and autism education, the hours spent designing and implementing the home-ABA program, and the repeated efforts to make the school officials aware of her concerns about RT's lack of progress. The Court also finds credible Mrs. T.'s testimony, discussed at greater length below, about her observations at Twin Hickory the day that the parents observed RT there.

The Court echoes the Hearing Officer's determination that Dr. Carlson presented the most credible testimony about the relative strengths and weaknesses of ABA and TEACCH methodology and the ability of those methods to provide educational benefit to RT. While Dr. Carlson may not have observed RT for as many hours as had his teachers, Dr. Carlson's testimony that the November 2002 IEP would not adequately address RT's deficiencies in joint attention or imitation skills was quite persuasive, especially when combined with the testimony of others such as Ms. St. Amand and Ms. Adkins who had observed RT at length. Moreover, the School Board's own witness, Dr. Swink, confirms their testimony.

Finally, mindful of Doyle's caution against reversing the credibility determinations of the trier of fact, the Court finds insufficient reason to reverse the Hearing Officer's decision to credit Dr. Oswald over Dr. Szarko. The Court understands the School Board's argument that this battle of the experts conceptually might have been won by Dr. Szarko. While Dr. Szarko has had less experience with autism and diagnostic analysis than Dr. Oswald, that alone would not preclude crediting Dr. Szarko. But, Dr. Oswald's knowledge and experience present valid reasons to accept his views where, as here, they are fully consistent with, and supported by, the record taken as a whole. Dr. Szarko reviewed RT's entire school file while Dr. Oswald only reviewed the materials provided to him by the parents. And, it is true that Dr. Szarko testified, and the School Board's cross-examination showed, that Dr. Oswald's assessment of RT's cognitive capacity may have been based on a non-traditional application of a particular language test.[13] Nevertheless, these aspects of Dr. Oswald's assessment are counterbalanced by his extensive training and years

---

**13.** The School Board challenged Dr. Oswald's conclusion as to RT's cognitive capacity in April 2000, arguing that RT's cognitive capacity had not been tested at that time. Dr. Oswald responded that he was able to assess RT's cognitive capacity based on the testing conducted in 2000 on RT's language skills and stood by his results. The Hearing Officer credited this response, and the Court does as well.

working with and diagnosing autistic children. Moreover, even the cold record supports the Hearing's Officer's decision to credit Dr. Oswald's views.[14]

## VII. Further Findings Of Fact

The Court finds that the findings of fact made by the Hearing Officer are correct and adopts them as its own. *See Doyle,* 953 F.2d at 105. The Court also makes the following additional factual findings which are established by a preponderance of the evidence.

As a result of tests conducted by Dr. Ronald David, the Chesapeake Center and Henrico County speech pathologist, RT was known by spring 2000 to have significant language disorders and delays strongly indicating that he was autistic. In the spring of 2000, HCPS identified RT as a student in need of special education services and, following the writing of an IEP ("April 2001 IEP"), provided him occupational and speech therapy through the home-based PEDD program. RT entered the center-based PEDD program taught by Patricia Nelson at Maybeury Elementary School in September 2001. The April 2001 IEP listed RT as Developmentally Disabled. RT was three and a half years old when he started at Maybeury.

Mrs. T. testified that Ms. Nelson was the best faculty member at HCPS with whom Mrs. T. had dealt. Mrs. T. also testified that, from time to time, Ms. Nelson pulled Mrs. T. aside to provide off-the-record information about RT's difficulties. For example, Mrs. T. testified that Ms. Nelson told Mrs. T. that RT needed more hours of education; that Mrs. T. should move RT to Chesterfield County because he would get better services there; and that Mrs. T. was "never going to get ABA

therapy out of" Henrico County. (Tr.2:118:15–16.) On cross-examination and rebuttal, Ms. Nelson, who was then still employed by HCPS, denied making these statements. However, the Hearing Officer stated that Ms. Nelson "by her appearance and manner on the witness stand appeared to be without credibility and reluctantly defended the County's selected teaching methodology." (H.O.'s Op. at 29.) The record provides no basis to overturn this credibility determination.

Through her testimony, Ms. Nelson presents as a dedicated teacher. She testified that she would spend fifty percent of the school day providing one-on-one instruction to the six or seven children in her PEDD class. If more attention was needed, Ms. Nelson said she would give it.

The record shows that, while in Ms. Nelson's class, RT engaged in self-stimming, would flap his hands especially when he was excited, and that he had a difficult time focusing. Ms. Nelson testified that RT often mouthed toys as a means of exploring them. She also testified that RT would refocus upon redirection, and that he could stay focused for two to three minutes at a time. While in Ms. Nelson's class, RT made progress in activities such as counting with a calendar, washing hands, staying in line while walking down the hall, choosing his own snack, and taking off his coat and hanging it up.

In the spring of 2002, Ms. Nelson invited Mrs. T. to observe RT in Ms. Nelson's class. Mrs. T. was shocked at how little progress RT seemed to have made. While other children were engaging in counting at the calendar as they pointed to numbers, RT did not point to any numbers and could not speak to count. Thereafter, in

14. The Hearing Officer gave thoughtful reasons for all of his credibility determinations; and, because the record fully supports those views, the Court independently reaches the same conclusions.

April 2002, the School Board prepared a new IEP for RT.

All the witnesses, including Ms. Nelson, testified that imitation skills are vital for early child education. Ms. Nelson's testimony shows that, when RT was three and a half to four years old, RT's imitation skills were in the range of 8–12 months. Ms. Nelson believed, and the record shows, that RT had significant cognitive delays at the time he was in her class. However, as stated above, although the parties concede that RT was significantly cognitively impaired, no evidence showed that RT was thought to be moderately mentally retarded at the time he was in Ms. Nelson's class.

During the spring of 2002, Mrs. T. learned about and began researching ABA therapy. After accumulating what seems to be a respectable lay-person's understanding of ABA therapy, Mrs. T., together with Amanda Adkins, developed and implemented a home ABA program. Ms. Adkins provided RT with in-home ABA therapy from August 2002 to August 2003. In October 2002, Ms. St. Amand, the speech therapist from the Faison School, helped improve RT's in-home ABA program.

Ms. Adkin's testimony shows that, in the late summer of 2002, RT lacked attending skills, was highly distracted, and engaged in self-stimulatory behaviors like facial ticks, staring at lights, and staring at the window. When given the opportunity to play, RT would crawl underneath the mini-trampoline set up in the room and stare at and touch its red covering. These behaviors are consistent with typical self-stimulating behaviors described by the witnesses and exhibits. As Ms. Adkins testified that, as a consequence of the stimming, it was very difficult to gain RT's attention, and RT would not maintain eye contact for more than several seconds.

RT lacked language skills, and he was not verbal when Adkins began working with him.

Carrie Anne St. Amand is trained in ABA therapy and improved RT's in-home ABA program by focusing on teaching RT attending skills. She testified that, when she first observed RT, he lacked the attending skills necessary—such as looking at the teacher and sitting still in the chair—to have an "actual functioning teaching session." (Tr.2:21:25.) Without these skills a teaching session was "a waste of time." (Tr.2:22:25.) Ms. St. Amand implemented a rigorous so-called errorless system using time delays that was designed to teach RT to attend, not giving him time to lose focus at first and decreasing the prompting as his focus time improved. Once Ms. Adkins and Ms. St. Amand were able to get RT's stimming under control, he was better able to attend to task. Ms. Adkins stated that this program made an "amazing difference" (Tr.1:249:25), and RT started to show consistent learning. The instructors implemented use of the Picture Exchange Calendar System ("PECS"), and RT began to make progress with PECS. At the time, RT seemed totally unfamiliar with the PECS even though he allegedly had used it in the HCPS classroom at Twin Hickory at the time. RT began to make progress with the PECS system at home.

By the Spring of 2002, Mrs. T. had become very concerned with RT's lack of progress in the PEDD program. She initiated his transfer to Twin Hickory's Autism Program and on September 4, 2002 an IEP team met to set RT's goals for the coming school year in Dara Butler's autism class. Mrs. T. presented her research on ABA therapy and explained the early success RT had had with home ABA therapy, and requested RT receive one-on-one

ABA-style therapy at Twin Hickory. (*See* Def.'s Exh. 32.B,C.)

HCPS officials explained TEACCH to the parents. Correspondence and notes taken by Mrs. T. from September 2002 show that the parents expressed serious concerns that TEACCH used the same techniques that had been used in the PEDD program, and that, consequently, RT would not progress using TEACCH. (Def.'s Exh. 32.E,F,G,H,I.) On September 4, 2002, the IEP team set an interim IEP that maintained the same goals as were in the April 2002 IEP. In the Fall of 2002, several evaluations of RT were conducted to help structure what was to become the November 4, 2002 IEP.

Shannon Raines, a Ph.D. psychiatrist, evaluated RT in late August 2002. Dr. Raines' report demonstrates that RT was an amiable, loving child who was mildly to moderately autistic. The report demonstrates that RT interacted minimally with his peers, had fleeting eye contact, limited attending skills, almost no verbal skills, and had cognitive skills in the 13—18 month range. His non-verbal cognitive skills exceeded his verbal cognitive skills. (SB–52 at 4.) Dr. Raines recommended that RT be placed in a classroom with a low student to teacher ratio such as with ABA therapy for a minimum of 15 hours per week. (*Id.* at 5.)

Karen Swink, an HCPS speech pathologist, conducted an evaluation based on her observations of RT over a three day period in mid-October. According to Dr. Swink, RT had made progress in the PEDD program. Her testimony reveals that, in the PEDD program, RT had improved his social integration skills somewhat, that he went from not being able to follow any directions in 2001 to following directions after repeated commands in the fall of 2002, but that he had made no progress at school with verbalization. (Tr.1:27–28) Additionally, she testified that, when RT began at Maybeury, he would only sit for 2–5 minutes, but, by the following fall, he would sit for up to thirty minutes. However, it cannot be determined from her testimony whether RT was paying attention to the activity while sitting for thirty minutes or engaging in stereotypic behavior.

Dr. Swink's study demonstrated that RT engaged in self-stimulating behavior. For example, she wrote "[d]uring his going through many toys [sic] he would produce random vocalizations, mouth the items, roll on the floor, scoot on his tummy, and lick the legs of the chairs or cart." (Def.'s Exh. 11 at 2.) She also testified that often RT could not utilize the PECS system even though a less complex PECS system had been used at Maybeury, that RT could not respond to one-step commands, and could not imitate the rolling of Play–Doh.

Dr. Swink administered a test called EASIC–R (Evaluating Acquired Skills in Communication Revised). RT was unable to respond to any questions on the Expressive Level I Skills Profile, and he responded to only two questions on the Receptive Level I Skills Profile. When Dr. Swink dropped back to the Pre–Language Skills Profile, RT demonstrated at the six month old range with a few scattered skills up to 12 months. At that time, RT was 4 years 7 months old. (Def.'s Exh. 11.) Dr. Swink stated that she had observed RT do better in the past, and explained RT's poor performance on these test as due to transition problems from Maybeury to Twin Hickory.

Julie Szarko, a Ph.D. psychologist employed by HCPS, conducted a evaluation of RT on behalf of HCPS to assess how to structure his IEP. The Hearing Officer decided not to credit Dr. Szarko's testimony and, as discussed above, the Court finds no cause to overturn that credibility determination. However, the Court adds that

Dr. Szarko's evaluation demonstrated that RT was able to imitate several actions; that RT's gaze would follow Dr. Szarko as she moved; and that RT lacked language skills and made no distinguishable verbalizations. Contrary to the School Board's argument that RT's cognitive capacity prevented him from making more progress than he had, Dr. Szarko's report states that RT "demonstrated various skills and emerging abilities in the cognitive performance area." (SB–61 at 3.) Finally, Dr. Szarko's report confirms that RT engaged in many self-stimulating behaviors such as mouthing toys and had difficulty attending to task and focusing on the examiner. (SB–61 at 3.)

In addition to these reports, Dr. Carlson, then head of the Faison School, evaluated RT in July of 2002 for forty five minutes as part of his application to the Faison School. She observed that RT had very few cognitive skills and very severe autistic symptoms. He engaged in a high frequency of self-stimulating activities, "was basically not able to engage in any purposeful activity," and was non-verbal. (Tr.1:177:15.)

At the hearing, Dr. Carlson testified convincingly that autistic children engage in self-stimulatory behavior for a variety of reasons including as a means of escape or to cope with other stimuli that may cause them discomfort. Further, education experts have learned over the years that the number of appropriate interactions a child has with the normal environment is essential to a child's positive cognitive development. By contrast, an autistic child's self-stimulatory behavior interferes with these interactions and stunts cognitive development. Dr. Carlson testified that, until RT's self-stimulatory behavior was diminished and he gained more attending skills, he would not make educational progress. The Court credits Dr. Carlson's testimony

because it is logical and is supported by the rest of the record and because of Dr. Carlson's up-to-date expertise about autism and the education of autistic children.

On September 9, 2002, RT moved from the Maybeury PEDD program to Dara Butler's autism class at Twin Hickory. Ms. Butler's class lasted three hours, used the TEACCH method along with PECS, a bit of a method called "Floor Time," and each child received fifteen minutes per day of one-on-one instruction with Ms. Butler. There were six children in the class plus a teaching aide. The instruction under TEACCH in this class emphasized fine motor, gross motor, social, self-help, communication, and pre-academic skills.

Ms. Butler testified that students do not need attending skills when they enter her class because she teaches those skills. However, that statement is refuted by the testimony of Dr. Carlson, Ms. Rusyniak, Ms. St. Amand, and Dr. Oswald all of whom stated that teaching attending skills requires time-intensive one-on-one instruction for far greater than fifteen minutes per day, which was the amount of one-on-one time that RT received at Twin Hickory. Ms. Butler also testified that other autistic children had progressed in her class and transitioned into non-autistic kindergartens. The Hearing Officer did not give this statement great weight, and the Court finds that with no additional record evidence to support or relate the other students' circumstances to RT's circumstances, it cannot be given effect in the decisional calculus.

Ms. Butler also testified that RT occasionally engaged in stimming, but could physically attend for up to 30 minutes. She also stated that his visual attendance improved from one second to three or four seconds in the several weeks he was at Twin Hickory. Ms. Butler recorded RT's work on his goals at the end of each day

and sent notes home to inform the parents about each child's progress. Testimony by Ms. St. Amand, Ms. Rusyniak, Mrs. T., and Dr. Carlson revealed that after-the-fact anecdotal data is far less reliable than recording a child's responses as the instruction unfolds. Based on her notes, Ms. Butler expressed the opinion that RT had made progress in her class. However, the Court finds that Ms. Butler's assessment of RT is entitled to little weight because it is based on anecdotal, rather than systematic, data collection.

RT's status in Ms. Butler's class seems most accurately described by Mrs. T., who, without RT's knowledge, observed him at Twin Hickory on November 13, 2002. During that visit, the parents were hidden from view with the use of room dividers. Mrs. T. took copious notes during the visit which appear as Defendant's Exhibit 16.

When the parents arrived at 11:05 am, the children were seated together in a circle. The teacher sought to make each student respond to commands such as "stand up," "arms up," and the like. RT was sitting in his chair but not paying any attention to the circle activities and instead staring up at a fluorescent light, stereotypic activity in which almost all the witnesses testified he often engaged. When it was RT's turn, RT successfully completed "stand up," "arms up," "clap hands," and "sit down." That was unsurprising, and of little probative import, because Mrs. T. and RT had been working on those commands at home for several months.

After circle, Ms. Butler had to escort RT to the PECS stand, assist RT with the PECS cards, and lead RT to the one-on-one station. At the one-on-one station, RT continued to stare at the lights and Ms. Butler did not redirect his attention. Ms. Butler attempted to get RT to make animal noises, but RT did not respond. RT was supposed to play with a peg-board, but instead he stared at the light and rubbed his hands over the peg board. Ms. Butler did not redirect RT's attention.

Following that activity, RT was led to a computer where he was supposed to interact with the computer using a mouse. However, Mrs. T. testified the computer program was non-interactive. Instead, RT sat there by himself for a few minutes clicking to no avail on the screen until he became distracted, turned the mouse over and began stimmming by stroking the mouse ball and running his hands over the texture of a computer speaker. Drs. Swink, Szarko and Raines also observed this stereotypical desire for tactile self-stimulation.

At snack time, RT was given his lunch box by the aide. The students are supposed to open their own lunch boxes and, using PECS, choose what snack they want. RT did not open his lunch box, and was unable to use the PECS system to communicate what he wanted to choose and eat. After trying unsuccessfully to get a response, the aide chose for RT and he ate. Ms. Butler then asked the children to throw their snack refuse in the trash. RT did not respond. After further prompting and direction, Ms. Butler took RT to the trash can and Ms. Butler had RT throw the trash out by directing his arms and hands.

RT was then seated at a individual work station with a puzzle and left on his own for ten minutes. RT did not engage with the puzzle. Instead, he stared at the beams of sunlight coming through one of the station's partitions. No teacher redirected his attention. Mrs. T. testified that she never observed Ms. Butler writing down any data. The parents left at 1 pm and the school day ended at 2:15 pm.

That evening, Ms. Butler sent a note to Mrs. T. stating that, after the parents had

left, RT had finished two puzzles with minimal prompting and practiced the tiger roar sound. With good reason, Mrs. T. considered Ms. Butler's note to be incredible. As stated above, the Hearing Officer found Mrs. T. to be highly credible, and documentary evidence and the other testimonial evidence establish that Mrs. T.'s testimony is credible and accurate.

Mrs. T. also testified that Ms. Nelson told Mrs. T. in confidence that Ms. Butler was planning to leave Twin Hickory soon because she was "just fed up with the IEPs that she's having to sign, knowing that—there's no way she can implement a 40 page IEP for each child in her classroom in the amount of time she has" with the limited resources provided by the county. (Tr.2:139:15–17.) According to Ms. Nelson, Ms. Butler was told to sign the IEPs because "it makes the parents happy." *Id.* When Mrs. T. asked Ms. Nelson why there was only one autism class in all of Henrico County given that there were likely more than seven autistic children in the county, and she asked Ms. Nelson to explain what the "autism class was really," Mrs. T. testified that Ms. Nelson responded that "the autism program has—This is what I wrote down—has become the dumping ground for the children of parents who complain." (Tr.2:140:10–14.) Ms. Nelson, however, told Mrs. T. that she would deny she ever said that "to the day I die," (Tr.2:140:19). When called as a witness by the School Board, Ms. Nelson denied that she had said such a thing, and stated that she would never state such as thing as she did not believe it was true. Mrs. T.'s recollection of the conversation was credited by the Hearing Officer and nothing in the record warrants a different finding.

On October 30, 2002, two weeks before the parents' visit to Ms. Butler's class, the IEP team had reconvened with the evaluations by Drs. Raines, Szarko, and Swink and data from RT's first six weeks at Twin Hickory. The Present Level of Educational Performance on the November 2002 IEP repeats, for the most part, the findings of Dr. Szarko's and Dr. Swink's evaluations. It reflected that RT has scored well-below average in occupational therapy, mouthed objects frequently, did not visually attend, became easily distracted, and did not respond to normal stimuli, but was a happy child who had increased his independence and had made notable progress responding to his name and using PECS.

Seventeen of the twenty-four IEP goals contained in the November 2002 IEP, were present in the April 2002 and September 2002 IEPs. RT had not achieved two-thirds of those goals, notwithstanding the efforts of the PEDD program during the spring and summer of 2002 and the six weeks of the Twin Hickory program.

Mrs. T. testified that she had asked that the goals be broken down into discrete objectives, as Ms. St. Amand had done with RT with much success. Ms. Rusyniak testified that the goals listed in the IEP were giant steps for RT, who had not yet received the intensive one-on-one instruction needed to teach him how to learn. That is, RT's goals did not so much underestimate his cognitive ability as require him to run before he could walk. Dr. Carlson testified that "it was striking that there was no goal in the IEP at all that addressed proper behavior for RT" with respect to reducing the self-stimming behavior so that RT could go on to learn the academic goals. (Tr.1:17:24–25.) At Twin Hickory, RT went to school 15 hours per week and received a total of 75 minutes of one-on-one instruction. The National Research Council at the National Academy of Sciences recently concluded that children with autism should engage in

a minimum of 20 hours of ongoing educational activities. Dr. Carlson testified that, at age four, RT's "cognitive window, so to speak, [was] wide open". (Tr.1:181:8.) That is, the time between ages two and six to eight presents the greatest opportunity to teach autistic children the cognitive skills they need because their neurologic functions are still developing. Dr. Carlson credibly testified that "absent from the TEACCH model are the number of direct instruction hours that we now know are critical to producing good skill gain in young children with autism" such as skills in language, cognitive skills, and attending skills. (Tr.1:182:14–17.) Dr. Carlson stated that, without a greater number of hours and more intensive one-on-one instruction, RT would not achieve the goals set out in the November 2002 IEP. Presented with that IEP and its seventeen still-unachieved IEP goals, the parents remained concerned that the TEACCH program, with its similarities to the PEDD program, would be ineffective for RT due to his lack of attending skills, documented need for one-on-one instruction, and difficulty learning in a group setting.

In response to the parent's request for, and success with, ABA therapy, the School Board refused to provide ABA therapy, stating in the IEP that "HCPS feels that [RT's] educational needs as outlined in his IEP can be met in the public school system. This would specifically include the Autism preschool program at Twin Hickory." (SB–70 at 21.) That statement is both entirely conclusory and insufficient because no actual reasons for the determination are given. There is no reason supplied for the obdurate refusal to even address the merits of the ABA program requested for RT. The basis for the refusal is best explained by the testimony of Dr. Driver, the Director of Exceptional Education for the HCPS, who stated that HCPS provides ABA therapy only to autistic students who demonstrate aggressive behavior or whose lack of attending skills disrupts group classes. RT did neither of those things.

Dr. Driver also testified that HCPS looks to TEACCH because it provides a "less restrictive environment" than ABA. However, Dr. Driver did not explain how a child like RT who had no imitation or attending skills could receive an appropriate education in the program offered at Twin Hickory. The record shows that the School Board's reliance on "the least restrictive environment" requirement is not substantive. Instead, it is a talismanic justification for not confronting or explaining the possibility that some method other than TEACCH might be appropriate for RT.

Finally, Dr. Driver made the conclusory assertion that autistic students make progress under the TEACCH method. However, she did not connect that conclusion to RT's case.

The parents rejected the November 2002 IEP, and, soon thereafter, gave notice that they intended to remove RT from Twin Hickory. Two days after their visit to Ms. Butler's class, the parents transferred him to the Faison School.

At the Faison School, RT flourished. Indeed, RT had no transitioning problems when he switched to the Faison School. RT went to school five days a week for six hours a day for the entire year (less some vacation time). All but 10–15 minutes of his school day entailed one-on-one instruction, although other children and other teachers were constantly around him. Ms. Rusyniak testified that RT required a highly structured learning environment because when he was given a break, he would revert to self-stimming. However, through constant redirection, the teachers

at the Faison School were able to greatly reduce the self-stimming. At first, the teachers had to put sheets up to cover the walls to prevent RT from being distracted. But, eventually, as the teachers honed his attending skills, they were able to take the sheets down and RT could attend without distraction. Ms. Adkins reported that after only two months at the Faison School, RT's "language just really blossomed, and he was able to verbalize with the PECS system." (Tr.1:252:16–18.) Not long thereafter, with a prompt, "he would repeat almost anything you said." (Tr.1:252:19.) By some point in the Summer of 2003, RT could say at least 100 words and would attempt to imitate saying anything that was said to him. According to Ms. Adkins, who continued to work with RT through the summer of 2003, RT had become a verbal child. (Tr.255:20–21.) That evidence demonstrates convincingly that RT's cognitive impairment was not what was holding him back in the HCPS.

In preparation for the due process hearing, the parents asked Dr. Oswald to conduct a psychological evaluation of RT. Dr. Oswald observed RT for three hours in December 2002 and again for two hours in March 2003, reviewed Dr. Raines' report and RT's IFSP from 2000 and portions of RT's record, and met with RT's parents, Dr. Carlson, and RT's teachers at the Faison School. Dr. Oswald conducted a test known as "ADOS–G" and determined that RT was clearly autistic. After administering a test known as the Bayley Scales of Infant Development—Second Edition, which measures cognitive ability, Dr. Oswald determined that RT had cognitive delays "similar to those seen in children

with at least moderate mental retardation" and a cognitive age of 14 months.[15] (Defs.'s Exh. 17 at 2.) His Preschool Language Scale score placed RT in the 13–17 month range. (*Id.*) Dr. Oswald stated that his testing and review of RT's records "suggests that [RT] made virtually no developmental progress in these areas [ (cognitive and language skills) ] between April, 2000 and December, 2002." (Def.'s Exh. 17 at 3.)

Dr. Oswald noted RT's exceptional gains at the Faison School, and stated that RT's "progress over the past few months in an intensive behavioral instruction program suggests that his performance on the structured instruments [*i.e.* the tests] ... may underestimate his potential." (Defs.'s Exh. 17 at 3.) Dr. Oswald concluded that, notwithstanding RT's inability to make gains in "traditional early childhood special education program, [RT] responds very positively to the intensive behavioral instruction approach and demonstrates a capacity to master skills at a higher rate than previously anticipated." (Def.'s Exh. 17 at 3.)

Although Dr. Szarko and the School Board challenged the method by which Dr. Oswald reached his conclusions,[16] the Hearing Officer chose to credit Dr. Oswald's conclusions over those of Dr. Szarko. The record supports that decision.

## VIII. Additional Factual And Legal Conclusions

 In light of the foregoing findings of fact, the Court finds, by a preponderance of the evidence that the November 4, 2002 IEP was not reasonably calculated to

---

15. Dr. Oswald made this finding after the November IEP was written.

16. Dr. Oswald used a measure called the Bayley Scales to assess RT. Dr. Szarko testified that RT was too old to be tested using the

Bayley Scales. However, Dr. Oswald testified that the Bayley Scales is an appropriate instrument to use on children whose actual age may be outside the Bayley Scale range, but whose developmental age is within it.

provide RT with the requisite benefit. *See Rowley*, 458 U.S. at 207, 102 S.Ct. 3034. The evidence demonstrated clearly that in the fall of 2002 RT engaged in a high frequency of self-stimulatory behaviors that interfered with his ability to learn, lacked all but the most basic attending skills, did not possess joint attention or imitation skills. Absent these skills, and until the stimming was brought under control, RT could not make any more than de minimis educational progress. The preponderance of the evidence also demonstrated that for RT to learn these skills and to stop stimming, RT required a rigorous, intensive education program of between 20 and 40 hours of instruction per week. The fifteen hours of instruction provided by the November IEP was insufficient.

Moreover, the preponderance of the evidence demonstrated that to learn attending skills, reduce the stimming, and learn imitation skills, RT required a highly structured, highly focused education methodology such as ABA therapy in which RT would receive intensive one-on-one instruction. The TEACCH program at Twin Hickory was not designed to, did not, and could not provide RT with this type of instruction. And, in the fall of 2002, the School Board understood that fact.

The Court finds that the School Board was not correct in its assessment that RT had made and could make adequate progress in the TEACCH program. Not unmindful of the significant funding limitations on the School Board, the Court finds that the School Board's conduct in this matter reflects the inertia to which Congress was referring when it wrote in the IDEA that "the implementation of this chapter has been impeded by low expectations, and an insufficient focus on applying replicable research on proven methods of teaching and learning for children with disabilities." 20 U.S.C. § 1400(c)(4). While RT may have made progress in certain self-help skills such as toileting, walking in line, throwing out trash, and sitting still in his chair, progress must be gauged against reasonably accurate evaluations of a child's potential. *See Rowley*, 458 U.S. at 202, 102 S.Ct. 3034. Where, as in this case, it is known that a different educational method has enabled a child protected by the IDEA to make real educational progress, the School Board may not dismiss that method with merely conclusory remarks in an IEP.

With respect to the IDEA's requirement of the least restrictive environment, several witnesses such Dr. Oswald and Dr. Carlson testified that RT's autistic symptoms precluded the development of significant social skills. Having found that RT did not have the attending skills needed to pay attention to his surroundings, did not make eye contact, engaged in a high frequency of self-stimulatory activities, and did not know how to imitate others' actions, the Court finds that, in the fall of 2002, RT did not have the skills to benefit sufficiently from social interactions in a less restrictive environment such as at Twin Hickory. Because the IDEA's least restrictive environment requirement works in tandem with the FAPE requirement, for RT—a child who failed to make educational progress in a social environment, and, moreover derived little benefit from that social environment a more restrictive environment was the appropriate environment until such time as he could benefit from greater social interaction. Accordingly, the Court determines that the parents have demonstrated by a preponderance of the evidence that the November 4, 2002 IEP was not reasonably calculated to provide educational benefit to RT.

At the administrative hearing, the School Board stipulated that the Faison

School provide RT with an appropriate education. For that reason, the Court need not assess the appropriateness of the Faison School placement. The Court holds that the Faison School was an appropriate placement for RT during the 2002–2003 school year.

For the foregoing reasons, judgment is granted in favor of the parents: the School Board failed to meet its statutory obligations under the IDEA and governing decisional law for the 2002–2003 school year including the extended school year ("ESY") term occurring during the summer of 2003.

## IX. RELIEF

### A. The 2002–2003 School Year

■ The IDEA empowers a court at the conclusion of a review of a due process hearing decision to "grant such relief as the court determines is appropriate." § 1415(i)(2)(B)(iii). That includes both retrospective and prospective injunctive relief. *Schl. Committee of Burlington, Massachusetts v. Dept. of Educ. of Massachusetts*, 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (retrospective relief); *Honig v. Doe*, 484 U.S. 305 327–28, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (prospective relief). In addition, under section 1412(a)(10)(C)(ii), "a court . . . may require the [public] agency to reimburse the parents for the cost of [private school] enrollment if the court . . . finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." *Id.* In sum, the IDEA grants broad authority to fashion and award appropriate relief, including reimbursement of private school costs.

■ The facts of this action fit within section 1412(a)(10)(C)(ii). Before the 2002–2003 school year, RT received special education and related services under the authority of a public agency (HCPS), and, thereafter, RT's parents enrolled RT at a private school without the consent or referral of the School Board. *See id.* As discussed above, Mrs. T. first expressed her desire that RT receive a different educational method at least as early as the September 2002 IEP meeting. The School Board dismissed this request with only a conclusory remark in the November 2002 The parents gave notice that they were removing RT to the Faison School ten days later. Whether this ten week interval between the September IEP meeting and the date RT left the Twin Hickory School represents a failure to provide a FAPE in "a timely manner" need not be decided because either way the "appropriate relief" clause (§ 1415(i)(2)(B)(iii)) provides authority to grant the parents relief in the form of reimbursement for the costs associated with RT's education at the Faison School from December 2, 2002 until the end of the 2002–2003 school year, including the ESY 2003 summer term. Accordingly, the School Board will be ordered to reimburse the parents for the relevant costs associated with that time period and judgment will be entered to that effect.

### B. Subsequent Years

The parent's Counterclaim requested relief in the form of reimbursement for the costs of the Faison School for the "stay put" (*i.e. pendente lite*) period, which, according to the terms of the Counterclaim, ran from October 3, 2003, the date the Hearing Officer was supposed to issue his decision on the merits, until March 20, 2006, the date when the parties reached an agreement on the proper educational placement of RT. (Counterclaim Count I and II.) The parents also requested reimbursement for any period not determined

by the Court to be covered by the "stay put" period. (Counterclaim Count III.)

By an Order (Docket No. 91) dated April 3, 2006, the Court requested that the parties file statements of position as to "whether, on the current record, a decision in favor of the parents on the merits of the case permits the Court to order the School Board to pay the cost of educating RT at the Faison School from October 3, 2003 (45 days after submission of the matter to the hearing officer) until March 20, 2006," the date the parties settled on an appropriate placement for RT at public expense. The parties responded. (Docket Nos. 92–94.)

The School Board makes a two step argument against awarding the parents relief for any period of time except the period covered by the Hearing Officer's decision. First, the School Board states that the parents failed to exhaust their administrative remedies as to the school years after the period covered by the Hearing Officer's decision ("the subsequent years") by failing to request a due process hearing for the subsequent years. As a consequence, the School Board states that the Court lacks subject matter jurisdiction to grant relief as to the subsequent years.

In response, the parents argue that, once the Hearing Officer ruled in their favor, the burden was then on the School Board to propose a new IEP and seek a due process hearing to adjudge the appropriateness of the proposed IEP. The parents state that the School Board has not yet requested a due process hearing, which is true, and they argue that the procedures established by the IDEA do not permit the School Board to litigate the validity of a proposed IEP in the first instance in federal court. As a consequence, the parents argue that the Court has subject matter jurisdiction to grant relief as to subsequent

years on the basis of the record made in the due process hearing as to the November 2002 IEP.

The parent's base their argument that they were not required to exhaust their remedies on the Fourth Circuit's decision in *DeVries By DeBlaay v. Spillane*, 853 F.2d 264 (1988). There, based on the facts of that case, the Fourth Circuit noted that, in a civil action pursuant to § 1415(i)(2), the district court "shall hear additional evidence at the request of a party." § 1415(i)(2)(B)(ii). The Court of Appeals in *DeVries* then held that "exhaustion [is] inconsistent with the statutory scheme when the complaint remains the same [for all years challenged] though the IEPs change." *Id.* at 267.

The School Board anchors its argument in *MM*, a case decided by a three judge panel issued subsequent to *DeVries*, but with no mention of *DeVries*. In *MM*, the Fourth Circuit held that "[w]hen parents of a disabled child challenge multiple IEPs in court, they must have exhausted their administrative remedies for each academic year in which an IEP is challenged." *MM*, 303 F.3d at 536. In *MM*, the parents retroactively challenged three separate IEPs for three separate years. *Id.* The *MM* plaintiffs' failure to exhaust their administrative remedies as to the first two of the three years required dismissal for lack of subject matter jurisdiction as to those two years. *Id.* In contrast, RT's parents did not challenge any years retroactively,[17] and they exhausted their remedies as to the one IEP (the November 2002 IEP) that they did challenge. As to the third year at issue in *MM*, the plaintiffs challenged the IEP for that year in a due process hearing and the Fourth Circuit held as to that year that:

---

**17.** That is, the parents did not challenge the IEPs for past years, such as the year at May-

beury, during which RT went to school pursuant to an agreed upon IEP.

A school district is only required to continue developing IEPs for a disabled child no longer attending its schools when a prior year's IEP for the child is under administrative or judicial review. *See Amann v. Stow Sch. Sys.,* 982 F.2d 644, 651 n. 4 (1st Cir.1992); *Burlington,* 736 F.2d at 794. Even if a prior year's IEP is contested and the school district fails to develop subsequent-year IEPs, "the losing party in the dispute over the contested IEP … *will have the burden of producing evidence and persuading the court of changed circumstances* that render the district court's determination as to the initial year inappropriate for guiding its order of relief for subsequent years." *Andersen v. Dist. of Columbia,* 877 F.2d 1018, 1022 (D.C.Cir.1989) (quoting *Burlington,* 736 F.2d at 795) *Id.* (emphasis in *MM* ).

Thus, the current rule as to relief for subsequent years in the Fourth Circuit seems to be that, "when the complaint remains the same though the IEPs change," no exhaustion is required. *DeVries,* 853 F.2d at 267. And, the party who loses before the district court on the merits of the appropriateness of the IEP for the initial year challenged has the "burden to produce evidence and persuade the court of changed circumstances that render the district court's determination as to the initial year inappropriate for guiding its order of relief for subsequent years." *MM,* 303 F.3d at 536.

In their statements of position (Dockets Nos. 92–94), the parties dispute the facts surrounding the alleged proposals and rejections of IEPs for the subsequent years. The Court has not yet received or heard any evidence on those disputed points. Thus, as to the subsequent years, it is necessary to hold an additional evidentiary hearing and order accompanying briefing.

The supplemental briefing discloses that the parties have expressed divergent views on such basic points as whether an IEP was proposed (for 2003–04) and when an IEP was proposed (for 2004–05). Facts of that sort are easily ascertainable, and it is simply not acceptable to have further delay and more litigation over those points and like matters. Thus, counsel are instructed to resolve such matters by agreement, and they are advised that, if the Court is required to resolve matters of that sort, the losing counsel will be required personally to pay the cost of litigating them.[18]

An appropriate Order as to the briefing on the subsequent years will issue.

It is so ORDERED.

---

18. The parents, for their part, should be mindful of *DeVries'* requirement that exhaustion is excused where the "complaint remains the same." The School Board, for its part, must bear its burden to show that changed circumstances render the use of this Court's determination as to the 2002–2003 school year inappropriate for fashioning relief as to subsequent years.